[Civ. No. 14303. Third Dist. Sept. 24, 1974.]

LOUISE LONG, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD, Defendant and Respondent.

**COUNSEL**

Turner & Sullivan, Robert J. Sullivan, Loren E. McMaster and Michael D. Stump for Plaintiff and Appellant.

Bardeen, Bersch & Kaplowitz and Blanche C. Bersch as Amici Curiae on behalf of Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Talmadge R. Jones, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**PARAS, J.**—Petitioner Louise Long was denied a writ of mandate by the trial court and appeals from the ensuing judgment in favor of respondent California State Personnel Board. She is an ordained Methodist minister and was employed as a Protestant chaplain at the Modesto State Hospital until it was closed in July 1970. Thereafter she worked as a chaplain at DeWitt State Hospital and later, and currently, at Atascadero State Hospital.

DeWitt Nelson Youth Training Center is a facility of the California Youth Authority located in Stockton, California. Petitioner indicated an interest in the position of Protestant chaplain at DeWitt Nelson, but her request was denied due to a "male-only certification" given that position by the respondent board. She initiated an appeal from the certification to the

State Personnel Board which conducted a full evidentiary hearing on March 27 and 29, 1972, presided over by Robert L. Hill, hearing officer. Mr. Hill rendered a proposed decision on April 18, 1972, which was adopted by the board on April 20, 1972, and which denied the appeal. The board found that the male-only certification requirement "constitutes a bona fide occupational qualification reasonably necessary to the normal operation of the center." The petition in the superior court followed.

Petitioner challenges the validity of the male-only certification on a number of specific grounds, all focusing upon the concept of sex discrimination in employment. She also claims a denial of due process in that the male-only certification was made without prior notice to her.

FACTS

The facts upon which the board based its decision to deny petitioner's appeal and to uphold the male-only certification are substantially these:

The DeWitt Nelson Training Center is an institution administered by the California Department of Youth Authority for the purpose of rehabilitating up to 400 young males who are committed there for a broad range of criminal offenses, including rape and other sex crimes. The average age of the inmate population is 19½ years (the spread is 18 to 23 years). The facility is located on a level 42-acre parcel surrounded by a 16-foot fence. Thus it would be over one-quarter mile in length and width, the premises being octagonal and roughly equilateral in shape.[1] Entrance is through the administration building at the center of the fence on the north. Two 100-bed living units are located in the eastern one-third of the 42 acres with a separate chapel structure between them. Two identical 100-bed units are located in the western one-third of the property with a kitchen-dining building between them. A school-shop-library building and a gymnasium and swimming pool are in the southern portion. The buildings are all set well back from a curved driveway which surrounds a quarter-mile running track in the center of the property. With only 9 buildings occupying less than one-tenth of the 42 acres, the buildings are all widely separated by open ground. Visual observation of the grounds is maintained from a control center at ground level in the administration building; the grounds are illuminated at night. But day or night, there are many areas on the grounds which cannot be seen at all from the control center.

The majority of the wards are committed to DeWitt Nelson by the criminal courts, not the juvenile courts. The institution receives the more ag-

---

[1] A diagram of the institution and the grounds was received in evidence by the hearing officer and a personal tour of the facility was made by him during the hearing.

gressive, delinquently oriented young men. It is a dangerous setting for all employees, both men and women.[2]

There are two chaplain positions at the institution, Protestant and Catholic. The office of the Protestant chaplain is accessible only from an outside door at the rear of the building in which it is situated. The Catholic chaplain has a similar office in the same structure, but the two offices are separated by a solid wall which also separates the two chapels, also located in the building. The office is used by the chaplain for private counseling sessions with wards. The building housing the chapels and chaplains' offices is remote from other buildings and occupied areas, and each chaplain is completely isolated unless the other chaplain is in his office at the same time.

The chaplain's duties require both individual and group counseling with the wards either at the chaplain's office or in the living units. Because the wards are usually involved in other programs during the day, such counseling is done in the evenings, and for this purpose the chaplain must move freely about the grounds and in the buildings. The chaplain's duties also require field trips away from the grounds on an individual or group basis, as for example to attend a Jewish or Mormon service.

Within the living units, security is provided by custodial staff. However there is no specific security to a person moving from building unit to building unit within the grounds, and there is insufficient staff to provide such security service for a chaplain during all hours.

There are a dozen or so other female employees both clerical and correctional, who work at DeWitt Nelson. They all work in locations where male staff members can see them at all times and are readily available for immediate assistance in case of emergency. Contact by these women with the wards is very limited. For example a female social worker who works in a living unit has male staff personnel within 50 feet of her at all times; this is typical.[3] At no time is any female employee isolated with one or more wards. The institution employs such women in its clinics, schools and other controlled settings because of a deliberate effort to "normalize" the institution as much as possible for the ultimate benefit of the inmates; it is not felt desirable to prevent the wards from ever seeing or in any way coming into contact with members of the female sex.

DeWitt Nelson has never had a female chaplain. There has never been

---

[2]The petitioner and the respondent through their counsel both stipulated to this fact at the administrative hearing.

[3]There are no male security guards hired specifically to protect female employees. Male staff employees perform their normal staff functions and are incidentally situated nearby.

an attack, sexual or other, against a female employee at DeWitt Nelson. Within the past two years, there were two forcible rapes committed at Karl Holton School, a Youth Authority facility immediately adjacent to DeWitt Nelson; also there were two attempted rapes of female personnel at the Preston School of Industry, another Youth Authority facility. And in O. H. Close School, another Youth Authority facility immediately adjoining De-Witt Nelson, there were two non-sexual attacks on female employees on the institution grounds. The average age of the wards at Holton is 17½ and at Preston 19½. In the Preston and Close facilities, the security is far more substantial than at DeWitt Nelson.

During the evening hours and up to 9 o'clock, the wards at DeWitt Nelson are permitted to move freely about the premises.

## I

*Was petitioner denied due process of law by the procedure under which the male-only certification was obtained?*

This question arises because no such certification existed at the time the DeWitt Nelson position became vacant and available to petitioner; she then had reinstatement rights to vacant positions in the classification "Protestant Chaplain." At this point the Youth Authority applied for the male-only certification to the State Personnel Board, which granted it, without any prior notice having been given to petitioner. Thereafter petitioner appealed to the State Personnel Board which did then appoint the referee and cause a full evidentiary hearing to be conducted and a proposed decision submitted, which was later adopted. At that hearing, petitioner was present and represented by counsel and was accorded a full opportunity to present evidence and argument on all her contentions regarding the male-only certification.

The same due process argument was raised at the administrative hearing. Before the evidence at that hearing got under way the hearing officer stated on this issue as follows: ". . . the legal issues will all be involved the same as though this were a complete hearing on the merits of the entire controversy. . . . I would . . . rule against you, Mr. Sullivan (on the due process issue) simply on the basis the certification was either right or wrong, and if it was wrong, we should correct it now, and if it was right, it is a moot matter. . . ." Counsel for petitioner, Mr. Robert J. Sullivan thereafter stated: "I realize there is nothing in this particular case you can do other than . . . setting it aside as an unconstitutional job discrimination but with respect to the procedures used by the board they will have to be corrected . . . in the future." The hearing officer then finally concluded:

"So we are really dealing with the whole question of whether or not the male-only certification is proper. We will have a proposed decision on that basis."

The issue is now moot. Granting that the petitioner had a right to notice and a hearing before the male-only certification was created, the matter is obviously of no moment at this time. She was in fact afforded that right and was present and took advantage of it. A full hearing was held on the entire issue of the legal propriety of the certification. The due process defect was cured.

 As this court has noted regarding quasi-legislative acts of administrative agencies, judicial review is limited to an examination of the proceedings to determine whether the agency's action was arbitrary, capricious or entirely lacking in evidentiary support. (*California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 815 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].) The hearing granted petitioner supplied the necessary record to enable this court to review the board's action in granting the male-only certification.

## II

*Does the male-only certification violate article XX, section 18 of the California Constitution?*

The provision reads: "A person may not be disqualified because of sex, from entering or pursuing a lawful business, vocation, or profession."

As early as 1881, our Supreme Court in *Matter of Maguire,* 57 Cal. 604, commented on this language as follows: "As we understand the section, it does establish, as the permanent and settled rule and policy of this State, that there shall be no legislation either directly or indirectly incapacitating or disabling a woman *from entering on or pursuing any business, vocation, or profession* permitted by law to be entered on and pursued by those sometimes designated as the stronger sex. . . . [*T*]*here are no exceptions in this section. . . .*" (Italics added.)

*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], striking down a California statute making it illegal for women to act as bartenders except in limited situations, spoke of the provision in the following terms: "As *Maguire* made clear, section 18 does not admit of exceptions based on popular notions of what is a proper, fitting or moral occupation for persons of either sex. *Although an inability to perform the tasks required by a particular occupation, sex linked or not, may be a justification for discrimination against job applicants,*

*under section 18,* mere prejudice, however ancient, common or socially acceptable is not." *(Sail'er Inn, Inc.* v. *Kirby, supra,* at p. 9.) (Italics added.)

*Locker* v. *Kirby* (1973) 31 Cal.App.3d 520 [107 Cal.Rptr. 446], in the face of a challenge based on the constitutional provision, upheld a regulation of the Department of Alcoholic Beverage Control which prohibited its licensees from employing or using topless waitresses on premises where liquor is sold. In the decision, the court commented as follows: "Article XX, section 18 of the California Constitution is not offended by the rule. It proscribes disqualifying a person from entering a lawful vocation because of sex. . . . [The rule against topless waitresses] does not prevent petitioner . . . from working as a waitress, nor indeed does it prevent her from doing so in topless dress so long as no alcoholic beverage license is involved on the premises in question." (P. 526.)

It can thus be seen that article XX section 18 has been given a literal interpretation by judicial decisions. Where a law generally prohibits a woman from pursuing an occupation which a man can pursue (or vice versa), the law conflicts with the constitutional provision. The words "business, vocation or profession" are used in their broad sense of designating a particular type of gainful activity as distinguished from a particular job at a particular location or in a particular way. Thus the bartending of the *Sail'er Inn* case is an occupation which the litigant there was not permitted to pursue by the law in question. The waitress activity forbidden by the law involved in *Locker* v. *Kirby, supra,* was not the occupation itself, but the pursuit of that occupation in a particular place and in a particular way. In other words article XX section 18 does not prohibit *regulation* of an occupation in such way as to exclude one sex under certain justifiable circumstances; rather it forbids a *prohibition* from the pursuit of that occupation by either sex.

Here the male-only qualification in no way prohibits petitioner from pursuing the occupation of minister or chaplain. It merely prevents petitioner from pursuing that occupation at the DeWitt Nelson facility. There is no conflict with article XX section 18.

### III

*Under the facts of this case, does the male-only certification violate the equal protection clauses of the federal and California Constitutions?*

There is no doubt that the male-only certification relative to a chaplain at DeWitt Nelson discriminates against members of the female sex. Although the United States Supreme Court has not by majority vote held sex

to be a "suspect" classification (*Fronteiro* v. *Richardson* (1973) 411 U.S. 677 [36 L.Ed.2d 583, 93 S.Ct. 1764]), the California Supreme Court has. (See *Sail'er Inn, Inc.* v. *Kirby, supra,* p. 20.) ■ Such being the case, the classification must be subjected to the "strict scrutiny" test when considering its propriety under the equal protection clause, as distinguished from the "rational relationship" test applicable in the area of economic regulation. Under the strict scrutiny standard, " '. . . the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " (*Sail'er Inn, Inc.* v. *Kirby, supra,* pp. 16-17.)

On the other hand, we are reviewing here a classification created by the State Personnel Board, a constitutional agency of the State of California. In *Pereyda* v. *State Personnel Board* (1971) 15 Cal.App.3d 47, 50 [92 Cal.Rptr. 746], we articulated the scope of appellate review of such decisions as follows: "Since the State Personnel Board is a constitutional agency for all its adjudicatory activities (Cal. Const., art. XXIV; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634 [234 P.2d 981]), its decision, which is the subject of this review, may be set aside only if it is found to be unsupported by any substantial evidence. All reasonable inferences must be drawn in support of the findings of the Board (*Hingsbergen* v. *State Personnel Bd.* (1966) 240 Cal.App.2d 914 [50 Cal.Rptr. 59]; *Neely* v. *California State Personnel Bd.* (1965) 237 Cal.App.2d 487 [47 Cal.Rptr. 64]). The findings and determination of the Board come before the reviewing court with a strong presumption as to their correctness and regularity. (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 330-331 [253 P.2d 659]; *Gong* v. *City of Fremont* (1967) 250 Cal.App. 2d 568, 573-574 [58 Cal.Rptr. 664]). The court may not take into account whatever evidence detracts from the weight of other evidence. (*Neely* v. *California State Personnel Bd., supra,* at p. 489.) [¶] 'The court may not substitute a decision contrary to that made by the department, even though such decision is equally or more reasonable, if the determination by the department is one which could have been made by reasonable people. . . .' (*Kirby* v. *Alcoholic Bev. etc. App. Bd.* (1968) 261 Cal.App.2d 119, 122 [67 Cal.Rptr. 628].)

"Inferences based upon circumstantial evidence are sufficient to support a finding. (*People* v. *Goldstein* (1956) 139 Cal.App.2d 146, 155 [293 P.2d 495].)"

Factual determinations are not subject to re-examination in a *trial de novo,* but are to be upheld by a reviewing court if they are supported by substantial evidence. *Neely* v. *State Personnel Bd.* (1965) 237 Cal.App.2d 487, 489 [47 Cal.Rptr. 64]. ■ The review is to be limited to con-

siderations of whether the board exceeded its jurisdiction, committed errors or law, abused its discretion, or made findings unsupported by substantial evidence. *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125 [173 P.2d 545]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33].

Petitioner argues that because of the strict scrutiny standard, we cannot and should not accord to the respondent board any presumption of validity of its action. It is claimed that to do so would be inconsistent and in contravention of the strict scrutiny standard and the burden resting upon the board under it.

■ We do not agree. We find no inconsistency between the compelling state interest concept and the presumption of validity of the board's action. Indeed the burden of the board must still be carried and we will review its action in the light of the strict scrutiny standard, and reverse if that standard has not been met. It does not follow however that to do so we must disregard the presumed propriety of the board's action. Particularly in the area of fact finding, the substantial evidence test should and does apply. The hearing officer in making his recommendations to the board and in conducting the hearing applied the strict scrutiny standard and imposed upon the board the burden of establishing the compelling state interest in the classification. Counsel for the board on appeal concedes that sex is a suspect classification which imposes the burden upon the board of demonstrating a compelling state interest, and readily has assumed that burden, maintaining that it has been met.

In our review the two concepts are harmonized, and we review the action of the board by applying the strict scrutiny standard and at the same time according to the board a proper presumption of validity of its administrative action. The question thus narrows down to whether the board has demonstrated a compelling state interest in restricting the job of chaplain at DeWitt Nelson Youth Training Center to men and not women. ■ We conclude that such interest has indeed been demonstrated.

In considering the validity of the classification, there are three separate and distinct interests which must be taken into account. First there is the interest of the petitioner, a woman who is being discriminated against in presumptive contravention of the equal protection clause of the United States and California Constitutions. This is a most vital interest, and it will not be lightly interfered with, particularly under the guise of "romantic paternalism" (See, e.g., *Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228.) "The desire to protect women from the general hazards inherent in many occupations cannot be a valid

ground for excluding them from those occupations . . . . Women must be permitted to take their chances along with men when they are otherwise qualified and capable of meeting the requirements of their employment. (See Kanowitz, Women and The Law (1969) pp. 33-34.) We can no more justify denial of the means of earning a livelihood on such a basis than we could deny all women drivers' licenses to protect them from the risk of injury by drunk drivers. Such tender and chivalrous concern for the well-being of the female half of the adult population cannot be translated into legal restrictions on employment opportunities for women." (*Sail'er Inn, Inc.* v. *Kirby, supra,* pp. 9-10.)

A second interest is that of the wards at the institution. These are young men who find themselves in difficulty with the penal laws of this state for one reason or another. They have an interest in the institution which they occupy which is absolutely vital to them. They are or should be concerned with achieving a proper outlook, obtaining training, and acquiring education and skills to enable them to take a decent place in society as mature adults. Anything which interferes with their rehabilitation, whether it be as a result of their own conduct or that of others, is to be considered of tremendous import.

The third interest is that of the administrators of DeWitt Nelson who are representatives of the people of this state; more appropriately, the public. It goes without saying that the interest of the public in the rehabilitation of the youthful wards is also of vital importance. Anything which tends to interfere with or impede or frustrate this objective of the institution, must be considered as being adverse to the interest of the public.

How are these three interests affected by the male-only classification? To analytically answer this question, we assume first that such classification did not exist and that women would be eligible to act as chaplains at DeWitt Nelson. What would the consequences be?

As disclosed by the evidence, there are several significant consequences of the use of a female chaplain. Because of the fact that the work requires night visitation to the dormitories we necessarily have an interference with the personal privacy of wards other than those being visited at a given moment. The informality of male dormitories is a matter of common knowledge. Doubtless the wards will not be particularly modest in their attire or lack of it, particularly in the evening hours.[4] It is to be expected that

---

[4]Ernst Taron, the superintendent of DeWitt Nelson put it this way at the administrative hearing: "My policy regarding women in any position is that I will not hire a woman in that position if her job requires that she be alone with a ward in an unsupervised area or in any other way it might inhibit the program. To elaborate on this a

otherwise normal things might be done or said by them in their relaxed living atmosphere which would not be desirable or proper in the presence of a woman, and would thus be avoided by them. At the same time the female chaplain's own sense of modesty might find itself substantially offended if the male inmates were so uninhibited as to disregard her presence.

Because the chaplain's duties require her presence alone with groups of wards, such as during field trips away from the facility, a second problem of physical control of the wards presents itself. An escape might be attempted or a physical altercation among wards might occur. It was felt by the administration that a woman chaplain would be less apt than a male to properly control such a situation.[5]

The third and truly substantial consequence is the danger to the female of sexual or other physical attack. The evidence clearly discloses that security at the facility is not such as to guarantee the safety of anyone on the premises and walking freely thereon. As to the danger from other than sexual attack, that of course would be common to male chaplains as well as female chaplains. As to the danger from sexual attack, doubtless a female would be subjected to it rather than a male.[6] In this regard the board found "that a population of up to 400 generally uninhibited young men confined in an institution away from any normal outlets would constitute an extraordinary danger for any woman known to be regularly alone and unprotected on the grounds." Such danger does indeed exist.

It is argued that there was no actual evidence of danger of rape to the petitioner, but only the administrator's opinion to that effect. Petitioner points to the fact that no women have been raped at DeWitt Nelson up to

---

little bit, we would like female youth counselors in the unit and it may not bother the woman to watch the wards being undressed and showering, but it would inhibit the program from the wards' standpoint. They would feel very embarrassed and very awkward and it would be degrading to them, so I don't particularly care whether it is a male or female in the capacity but from the standpoint of the ward himself. In other words, I may not look at the position as male or female but I think the ward does, and that makes a big difference."

[5] Albert Anderson, Chief of the Rehabilitation Services of the Youth Authority for Northern California, put it this way: "Some of the other program elements that historically the Youth Authority has carried out in the religious field is to bring groups in from local churches to participate with our young people in activities and to take our young people off the grounds to local churches and to other activities. [¶] We don't feel, based on our experience, that a woman can be held responsible for the security, both from the standpoint of escape and the standpoint of potential of difficulty between individuals or groups."

[6] Petitioner contests this conclusion and argues among other things that there is no proof of any greater danger from sexual attack upon a male chaplain than upon a female chaplain. This contention is nonsense. It is women who are generally raped, not men.

this time, despite the fact that there are a number of female employees located there. That argument of course ignores the fact that none of these female employees are ever in isolated contact with the wards, alone anywhere on the grounds, or present other than during working hours. It is argued that despite this, before a conclusion of such danger can be reached, there must be an empirical showing that in fact rape of females occurred. If we understand petitioner's contention in this regard, we would have to permit a woman to hold the job, and if after a substantial time no rapes occurred we could then conclude that there is no danger; if on the other hand a half dozen rapes occurred, the board would be proven correct. In effect the argument asserts that good sense is not to be applied at all in reaching certain conclusions. Anyone who maintains that women in general (not petitioner in particular) working alone and at night within a facility which occupies one-quarter mile square of space and is populated solely by male criminal offenders between the ages of 18 and 23 years of age, are not in danger of sexual attack, is not using his good sense. Necessarily on some matters evidence cannot be produced. It is to be expected that reasonable intelligence will be used in evaluating future possibilities. The application of such intelligence tells us, as it told the administrative personnel at DeWitt Nelson, that sexual attack upon a woman alone on the premises under the circumstances of the job requirement in question, is not only a possibility but a probability.

But if evidence is required, the danger of rape or sexual attack is demonstrated by the fact that in three other youth authority facilities where male inmates are housed, two of them immediately adjoining the DeWitt Nelson facility, within the past two years four rapes and attempted rapes have occurred and two non-sexual physical attacks also have occurred.

Having concluded that the use of female chaplains could reasonably be expected to have three consequences, interference with privacy of the wards, inability to control and discipline the wards, and danger of sexual attack, we now consider the effect of these consequences upon the three interests concerned with our problem. Is the effect such that constitutionally there is a compelling state interest in making the position unavailable to women, thus eliminating the consequences?

First as to the petitioner and the class of women generally who are excluded from the position, the effect from a constitutional standpoint is nil. As stated in *Sail'er Inn* and in the civil rights cases to be hereafter discussed (*Weeks* v. *Southern Bell Telephone & Telegraph Company, supra,* 408 F.2d 228; *Rosenfeld* v. *Southern Pacific Company* (9th Cir. 1971) 444 F.2d 1219; and *Green* v. *Waterford Board of Education* (2d Cir. 1973)

473 F.2d 629), fear for the safety of the woman is no justification for the classification. That is an individual concern to be left up to each applicant seeking the specific employment. The petitioner here is aware of the danger and if she chooses to accept it, she must be accorded that opportunity. She knows what goes on in a male dormitory and may choose not to worry about it. Therefore, looked at from the point of view of the members of the class being affected, the consequences do not justify the classification and cannot begin to show a compelling state interest therein.

Looked at from the point of view of the inmate, quite a different result obtains. Our concern in this regard is partially illustrated by the following testimony given at the administrative hearing by the DeWitt Nelson superintendent. "Q. If the Protestant chaplain were a lady how would it in your view impair her effectiveness as a chaplain? A. As I view the position, she has to take wards off campus unsupervised, probably on a one to one basis, to a Mormon service or a Jewish service, one ward. I would, under my present policy, I would not permit this. Q. Would you permit a man to take the ward off on a one to one basis? A. Right. Q. A male chaplain? A. Yes. Q. Why do you distinguish between the male and the female? A. Because the ward looks at the female differently than I might. Q. And how does he look at her differently? A sex object? A. Potentially. Q. Do you have any experience with respect to males and females taking wards off the grounds on a one to one basis which supports your opinion? A. Not as such, Mr. Sullivan, but I have experience in placing wards under unnecessary hazardous conditions, let me put it that way. If I know a ward is subject to heroin usage and I leave heroin lying around, I feel I am guilty of this guy using heroin. If I have a sex offender who I know is a very acting out person and I subject him to a one to one relationship where he can involve himself in a sex offense, I think I am guilty. It is my job to protect the wards and to protect the program."

As hereinabove suggested, to expect that no sexual assault will be committed by any of up to 400 men of the average age of 19½ years who are in effect imprisoned while undergoing a rehabilitative process, is to expect too much. At best it is foolish to put temptation of this sort into the path of such wards when it can reasonably be avoided.

And the effect upon the ward who succumbs to temptation and commits the sexual offense is disastrous. He has committed a separate crime for which he can and probably will be independently punished. He has interrupted his course of rehabilitation; and very possibly rehabilitation in his case has been utterly thwarted, with the result that a youthful offender who might have returned to society as a law abiding, productive citizen does precisely the opposite and becomes a perennial outlaw.

To a lesser extent, the same interruption or frustration of the rehabilitative process might well result from an escape or an altercation between wards. Admittedly it is not the function of a chaplain, male or female, to be a disciplinarian, but it is indisputable that a male chaplain would generally better be able to prevent an escape (or attempt to escape) or control a quarrel or fight among wards than a woman.

In the process of rehabilitation, the state of mind of the ward is of great importance. We therefore also agree with the superintendent that the wards' right of privacy should be respected, which affects their mental attitude, and which in turn fosters and promotes the objectives of the institution.

The third interest concerned with the classification, that of the public, is also affected by any ward misconduct, particularly a sexual attack. Primarily there is the derivative adversity to the public in losing the rehabilitation of a young man. When society loses a citizen to habitual crime, it not only loses a part of itself but also acquires an unwelcome liability. Secondly, there is the confidence of the public in the rehabilitative programs of the Youth Authority and in its facilities such as DeWitt Nelson, which undoubtedly would be affected by publicity of this sort. What can the public think of a rape that occurs within the facility only because the supervising personnel permitted a woman chaplain to work on the grounds under these circumstances, at night and alone? And thirdly the confidence of the administrative personnel of the facility would also be substantially affected by such an incident. It is to be hoped that those who are operating the facility are sincerely dedicated to the concept of rehabilitation of young people and that they are also optimistic about it. When their efforts are frustrated by unnecessary criminal offenses of wards it is to be expected that they too will be disillusioned at the sheer folly of taking chances where chances are utterly unnecessary and can be avoided.

A single instance of rape or sexual attack, particularly of a religious person at an institution of this type, can have devastating effects. It is to be avoided if at all possible. We cannot conceive of any more vital interest of the state than the rehabilitation of its youthful criminal offenders. Whatever must be done during the process of rehabilitation to avoid endangering that process or hindering it in any way is properly to be done.

Thus the interests of the public and those of the inmates are substantially different from those of the petitioner and the members of her class. The former interests are so overwhelming as to constitute a compelling state interest in the male-only certification, thus satisfying equal protection standards. The classification is clearly necessary to further this interest. Petitioner's interest, although itself very important, must yield.

Argument was presented and even evidence to the effect that physical adjustments could be made to prevent these incidents. Security guards could be hired, alarm systems could be expanded, buildings could be moved, and procedures changed. However wo do not view the duty of an employer to refrain from discrimination based upon sex as requiring him to alter substantially his facility and procedure to suit the sex of the person involved. Certainly reasonable adjustments should be made, otherwise equal protection rights of either sex could be thwarted by contrived non-sensical conditions. But here there is nothing reasonable about a require-ment that a full time security guard be made available to avoid the danger of attack. The testimony of the Rehabilitation Services Chief suggests a further partial answer to these arguments: "Q. Well, let me put it this way. Is there any reason why the chaplain's office cannot either be made safer by installing an alarm system or moved to one of the more secure adminis-trative buildings? A. Yes. The office could be moved. Q. It could? A. I don't quarrel with that at all but I don't expect the chaplain to spend his time in that office. I expect him to be out working with kids. It is what they are paid for, and if we are put into a position where all we want the chaplain to do is sit in his office up here in the administrative building, I don't want a chaplain. There would be some other way."

## IV

*The 1964 Civil Rights Act.*

The 1964 Civil Rights Act contains the same prohibition against dis-crimination on account of sex as by decisional law has been placed in the federal and state equal protection clauses.

42 United States Code section 2000e-2(a) reads in part as follows: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire . . . any individual . . . because of such individual's . . . sex . . .; or (2) to . . . classify his employees . . . in any way which would deprive or tend to deprive any individual of em-ployment opportunities or otherwise . . . affect his status as an employee, because of such individual's . . . sex, . . ." 42 United States Code sec-tion 2000e-2(e) contains an exception as follows: "Notwithstanding any other provision of this subchapter . . . it shall not be an unlawful employment practice for an employer to hire and employ em-ployees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enter-prise . . ."

In *Weeks* v. *Southern Bell, supra,* 408 F.2d 228, 235, the court laid down the test for applying this exception as follows: "We conclude that the principle of nondiscrimination requires that we hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved."

*Weeks* held that a switchman's job, requiring the lifting of items up to and exceeding 30 pounds in weight, was not such as to disqualify women under the bona fide occupational qualification (hereinafter B.F.O.Q.) exception.

*Rosenfeld* v. *Southern Pacific Company, supra,* 444 F.2d 1219 held that the duties of agent-telegrapher for the railroad were not such as to bring that position within the B.F.O.Q. exception, and invalidated certain provisions of the Labor Code of California as being in conflict with the Civil Rights Act.

*Green* v. *Waterford Board of Education* (2d Cir. 1973) 473 F.2d 629 held that a requirement that a pregnant teacher be terminated not less than 4 months prior to expected confinement violated the Civil Rights Act.

■ Applying the language of *Weeks,* we must conclude that in this case petitioner comes within the exception. Again there are three interests to be considered, those of the petitioner, the wards, and the public. Bypassing that of petitioner, we must conclude that she cannot efficiently perform her duties in view of the latter two interests.

A case very helpful in this regard is *City of Philadelphia* v. *Pennsylvania Hum. Rel. Com'n* (1973) 7 Pa.Cmwlth. 500 [300 A.2d 97]. That case construed a provision of the Human Relations Act of the Commonwealth of Pennsylvania which prohibited discrimination in hiring based upon sex, but excluded "bona fide occupational qualifications"; which the Pennsylvania high court construed as meaning the same as the same language in the Civil Rights Act. The case involved job specifications issued by the Civil Service Commission of the City of Philadelphia for the position of Youth Center supervisors and Youth Center superintendents.

Children housed at the Youth Center of the City of Philadelphia were defined thus: " '[r]outinely, juveniles ordered detained at the Center range in age from seven to sixteen and older juveniles are on occasion, included in the population . . . . All manner of police charges against them are included; aggravated assault and battery, assault with intent to ravish, assault with intent to kill, and murder . . .' ." (*City of Philadelphia* v. *Pennsylvania Hum. Rel. Com'n, supra,* at p. 101.)

The duties of a supervisor included the observation of the daily showers of the inmates and also the observation of the inmates within the living unit in varying degrees of undress; also the conduct of searches of the person for contraband whenever necessary.

The Pennsylvania Commonwealth Court held that a classification of male supervisors to supervise male inmates and female supervisors to supervise female inmates was a proper classification and within the B.F.O.Q. exception. This holding was made in the face of the traditional challenges against discrimination in employment on account of sex.

The court stated at page 102 (after reviewing the holdings in *Weeks* and *Rosenfeld, supra*) as follows: "There is no question that a woman is equally qualified (or disqualified) to conduct a search for contraband as well as is a man. However, the vital factor that the Commission here disregards is 'who are the people being searched? If sex is not 'relevant' in the supervision of children who range in age from seven to sixteen in various stages of undress, where can it be?

". . . . . . . . . . . . . . . . .

"The children at the Youth Study Center have a history of troubled and varied backgrounds. Emotional and social problems are the rule and not the exception. It is the role of the Supervisor to gain the confidence and the respect of the children in order to aid them in regaining a proper perspective of the trying problems of growing up in a dangerous, hostile, competitive world. The Commission cannot expect the City to produce cold, empirical facts to show that girls and boys at this age relate better to Supervisors of the same sex. It is common sense that a young girl with a sexual or emotional problem will usually approach someone of her own sex, possibly her mother, seeking comfort and answers. For girls in the Youth Center, their Supervisors are their only advisors. A like situation prevails for the boys. To expect a female or a male supervisor to gain the confidence of troubled youths of the opposite sex in order to be able to alleviate emotional and sexual problems is to expect the impossible."

The argument was raised in the *Philadelphia* case, as has been done here, that no *facts* were adduced to support the claimed propriety of discrimination. In addition to the foregoing, the court further commented: "[It is suggested] that no *facts* were adduced by the City in support of its contention that personal contact under very intimate circumstances must be limited to contacts between persons of the same sex. Once again, the Commission seeks *facts* in an area where *facts* are not available. Laws forbidding discrimination in hiring on the basis of sex do not purport to

erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological differences between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex." (P. 103, fn. 7.)

We accord with the view expressed in the *Philadelphia* case and find a substantial similarity between its facts and the one with which we are dealing.

In all of the cases involving employment classifications based upon sex, the two concepts of equal protection under the Constitution and discrimination under the Civil Rights Act run hand in hand. After reviewing the cases involving both concepts, it is our conclusion that the considerations in which the court must engage are substantially the same. Under equal protection, the court must treat the classification as suspect, or at least one subject to careful scrutiny, and place the burden upon the person maintaining the validity of the discrimination to show that there is a compelling state interest in its maintenance. It is difficult to conceive of a compelling state interest in the limitation of an occupation to one sex alone unless all or substantially all members of the other sex cannot safely and efficiently perform it. Conversely, if all or substantially all members of one sex cannot safely and efficiently perform it, the state has a compelling interest in limiting the occupation to the other sex.

The Civil Rights Act's B.F.O.Q. exception leads us to essentially the same inquiry. Again any discrimination based upon sex is suspect and to be carefully reviewed. The burden is upon the entity or person creating the discrimination to justify it by demonstrating that all or substantially all members of the other sex could not satisfactorily perform the functions of the particular employment. When this has been done, a qualification limiting the employment to the one sex only is at once bona fide under the Civil Rights Act and justified by a compelling state interest under equal protection.

Because of the adverse effect upon the wards and the public of the consequences of using women in the position of Protestant chaplain at DeWitt Nelson, as outlined above, we find the male-only certification to be within the B.F.O.Q. exception of the Civil Rights Act. Thus there is no violation of the act.

The judgment is affirmed.

Richardson, P. J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 11, 1974. Richardson J., did not participate therein. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.