IOWA DEPARTMENT OF SOCIAL
SERVICES, IOWA MEN'S RE-
FORMATORY, Appellant,

v.

IOWA MERIT EMPLOYMENT DEPART-
MENT, Iowa Merit Employment Com-
mission, and Cynthia Gunther, Appel-
lees.

No. 59913.

Supreme Court of Iowa.

Dec. 21, 1977.

Richard C. Turner, Atty. Gen., and Stephen C. Robinson, Special Asst. Atty. Gen., for appellant.

Larry L. Seckington, Des Moines, for appellee Iowa Merit Employment Commission.

Gordon E. Allen, Des Moines, for appellee Gunther.

HARRIS, Justice.

This dispute between two state administrative agencies arose from the attempt of Cynthia Gunther (the intervenor) to raise her employment classification at the men's reformatory. The Iowa department of social services, men's reformatory (the department) has the ultimate responsibility for the operation of the men's reformatory at Anamosa. The Iowa merit employment department, Iowa merit employment commission (the commission) is charged with enforcing the Merit System Act (ch. 19A, The Code). The controlling question is whether a bona fide occupational qualification exception (BFOQ) exists which prevents a woman employee from undertaking the duties of a reformatory corrections officer II (CO II). The trial court determined no BFOQ existed for the position. The trial court ordered the intervenor to be placed in the CO II classification. At the same time the trial court ordered, in view of the intervenor's status as a woman, that she be exempted from certain duties routinely required of men in the same classification. We agree there are certain duties routinely required of a CO II which, as a practical matter, are impossible for a woman to perform. We believe such impossibility renders the CO II classification a proper subject for a BFOQ. We reverse the trial court.

The most significant facts in this dispute are (1) that all inmates of the Iowa men's reformatory are males, and (2) the intervenor is female.

Under the statutory scheme for punishment of public offenders in Iowa it is contemplated that the older criminals and recidivists should be committed to the men's penitentiary at Fort Madison. § 789.16, The Code. The men's reformatory at Anamosa is generally considered a medium security facility. On the other hand the legislature provided a scheme for ready transfers between the penitentiary and the reformatory. §§ 246.12, 246.13, 246.14, The Code. Thirty-five percent of inmates at the reformatory have been convicted of crimes of violence, including sex offenses. Clearly

the inmate population at the reformatory has a far greater tendency to violence than does the general population. The inmates are deprived of normal sexual experiences. Many of them react spontaneously with little thought of consequences.

The correction officers who make up the operating personnel of the reformatory are of four classifications. The first classification is that of correction officer I (CO I). This is generally the beginning classification for a new officer at the reformatory. A CO I rotates through various tasks on a somewhat limited basis. A number of officers, by reason of age, physical condition, or perhaps for various other reasons are never elevated beyond the CO I classification.

CO II's are subject to general duty throughout the institution. They can perform all the functions of a CO I and significant additional tasks such as riot control, patrol of cell blocks, and superintending inmates' bath and shower rooms. CO II's conduct frequent "pat searches" and "strip searches" of the inmates. While patrolling cell blocks CO II's are in full view of the cells themselves. They can, and frequently do, view the inmates' toilet. In general CO II's are in much closer and direct personal contact with the inmates than are CO I's. The record is clear a female CO II would be in very real danger of sexual attack.

Some CO II's advance to higher classifications as CO III and CO IV officers. Some CO II's do not so advance. With each advancement authority and pay increase.

Petitioner is a four-year college graduate. Except for her sex and lack of institutional experience there is no question that, with additional training, she would possess the qualifications of a CO II officer. When employed as a CO I officer she was assigned duty in the visitors rooms, central control, and tower watch. Eventually she sought advancement to CO II which will cause her to be rotated through all assignments. Because some assignments as a CO II officer would be impractical for any woman the department refused to promote her. The department also refused to create a distinct classification for her by calling her a CO II and omitting the duties she could not perform. Petitioner thereafter appealed to the merit commission which ruled in her favor. The commission directed that she be given the CO II classification but in effect created a new and distinct classification by exempting her from "pat" or "strip" searches and from assignments to the cell blocks.

On appeal the trial court affirmed the merit commission "* * * with the common sense exemption noted both by the agency below and the *Reynolds* court [*Reynolds v. Wise*, 375 F.Supp. 145, (N.D. Tex.)] that these officers should not be placed in job duties that may reasonably be expected to breach inmates justified expectations of personal privacy." The reformatory appealed to this court. There is no cross-appeal.

I. All parties concede the intervenor cannot perform all tasks routinely assigned to male CO II's. In her brief and argument intervenor states:

"*Admittedly there are certain job duties and job functions which the intervenor cannot perform either because of inmate privacy rights, or the necessity to avoid compromising positions. However, that is not to say that the intervenor cannot be promoted through the classification system. * *.*" (Emphasis added.) The commission eliminated from the intervenor's duties "* * * assignment to dormitories [cell houses?] or shakedown * * * to insure privacy."

For reasons which will appear we agree and hold the intervenor's womanhood prevents her from performing all CO II functions at the men's reformatory.

II. The parties point to provisions of different but somewhat related Code chapters. The department points to chapter 601A, The Code (Iowa Civil Rights Act of 1965). Section 601A.6(1)(a) provides in part:

"It shall be an unfair or discriminatory practice for any * * * [p]erson to refuse to hire, accept, register, classify, or refer for employment, to discharge an employee, or to otherwise discriminate in em-

ployment against any applicant for employment or any employee because of * * * sex * * * *unless based upon the nature of the occupation [the BFOQ exception]. * * *.*" (Emphasis added.)

The commission points to chapter 19A, The Code, (the Merit System Act). Section 19A.18 provides:

"No person shall be appointed or promoted to, or demoted or discharged from, any position in the merit system, or in any way favored or discriminated against with respect to employment in the merit system because of his * * * sex * * *." Chapter 19A contains no BFOQ clause.

Section 19A.22 provides:

"The provisions of this chapter, including but not limited to its provisions on employees and positions to which the merit system apply, shall prevail over any inconsistent provisions of the Code and all subsequent Acts unless such subsequent Acts provide a specific exception from the merit system."

The commission argues the absence of a BFOQ from chapter 19A combined with the provisions of 19A.22 show the legislature intended to deny any BFOQ exemption for Iowa merit employees such as the intervenor.

Before addressing the commission's contention a threshold problem should be mentioned. We have noted the commission held for the intervenor but excepted her from performing the duties which would form the basis for the BFOQ. The commission's order was affirmed by the trial court. Neither intervenor nor the commission cross-appealed when the department brought this appeal. It is suggested the failure of the intervenor or the commission to cross-appeal makes it unnecessary to consider whether a BFOQ exists for any merit employees. However we believe the absence, under these circumstances, of a cross-appeal does not conclude the question. The commission could scarcely appeal from a district court's total affirmance of its own decision. Nor would we expect the intervenor to appeal from a ruling granting her CO II status and pay without any obliga-

tion to perform the duties her brief concedes she cannot perform.

Turning to the two Code chapters referred to we do not believe the legislature's failure to include a BFOQ provision in § 19A.18 indicates a total prohibition of BFOQ provisions for that chapter. We note that § 356.5(6), The Code, requires jailers "[t]o have a matron on the jail premises at all times during the incarceration of any one or more female prisoners * *."

We do not think the department of transportation is prohibited from hiring male attendants for male restrooms or females for female restrooms in highway rest stops. But the commission's interpretation of § 19A.18, precluding BFOQ exceptions, would make such hiring practices impossible. Similarly, we do not believe male officers could be required, for lack of a BFOQ clause, for a CO II position at the women's reformatory at Rockwell City.

In any event the absence of a BFOQ provision in § 19A.18 could not justify an unconstitutional invasion of the inmates' rights to human dignity and privacy.

Consideration of inmates' constitutional rights requires mention of another threshold question. Were the inmates' constitutional rights an issue raised in these proceedings? We think the answer is plainly yes.

The inmates' constitutional right of privacy was an issue at every step in these proceedings. In his opening statement before the commission the intervenor's counsel stated "* * * [T]he appointing authority will want to tell you that it [placing females in CO II position] endangers the privacy of the particular inmate * * *." Much evidence was devoted to the privacy rights of inmates including the department's exhibits 8 and 9. We note also that the commission's final ruling recognized the constitutional right of privacy and expressly exempted the intervenor from certain assignments "to insure inmate privacy."

The trial court observed the commission had found inmate privacy rights were in-

volved and further found "* * * these [female] officers should not be placed in job duties that may reasonably be expected to breach inmates' justified expectations of personal privacy."

On appeal the department's brief urges the commission's ruling was based on an error of law in that sex must be a BFOQ because otherwise inmates' right to privacy would be violated. Finally intervenor's brief on appeal expressly concedes the point: "Admittedly there are certain job duties and job functions which the intervenor cannot perform either because of inmate privacy rights, or the necessity to avoid compromising positions. * * *."

■ The parties, the commission, and the trial court conceded the obvious when they recognized the existence of a personal right of privacy with respect to one's own body and bodily functions. Such a right is guaranteed by several provisions of the federal constitution. See *Hodgson v. Robert Hall Clothes, Inc.*, 326 F.Supp. 1264, 1269 (D.C. Del.1971); *Henderson v. United States*, 390 F.2d 805, 807–808 (9 Cir. 1967). See also *York v. Story*, 324 F.2d 450, 455 (9 Cir. 1963) where it is said: "We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."

In general prisoners possess sensibilities to exposure of the body and its functions approximating those of people in a free society. See Schwartz, *Deprivation of Privacy as a "Functional Prerequisite": The Case of the Prison*, 63 J.Crim.L.C. & P.S. 229 (1972).

Of course, "* * * [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. * * *." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, 1369 (1948). See *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629, 638 (1977); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974).

■ However to the extent consistent with those considerations, prisoners retain a residuum of constitutional rights. *Wolff v. McDonnell*, 418 U.S. 539, 556–572, 94 S.Ct. 2963, 2974–2982, 41 L.Ed.2d 935, 950–960 (1974); *Kelly v. Brewer*, 525 F.2d 394, 399 (8 Cir. 1975); *Teterud v. Burns*, 522 F.2d 357, 359 (8 Cir. 1975); *Rudd v. Ray*, 248 N.W.2d 125, 128 (Iowa 1976).

■ It is not suggested by any party the exposed cells of the reformatory should be modified. No one suggests supervision of prisoners as they toilet or shower can be eliminated. No one claims strip searches of the inmates can be abandoned. It seems such continuous supervision by male guards will be necessary security requirements at the reformatory. It is apparent, and is undisputed, there would be a constitutional violation of inmates' rights if the guards were women. Cases from other jurisdictions indicate continuous surveillance by one of the opposite sex violates a right of personal privacy. *In re Long*, Cal.App., 127 Cal.Rptr. 732 (1976); *Long v. California State Personnel Board*, 41 Cal.App.3d 1000, 116 Cal.Rptr. 562 (1974); *City of Philadelphia v. Pennsylvania Hum. Rel. Com'n*, 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973).

We hold the absence of a BFOQ provision in § 19A.18 cannot justify an invasion of inmates' constitutional rights. Accordingly the decision of the commission was "[a]ffected by * * * [an] error of law", under 17A.19(8)(e), The Code. Hence the decision of the commission must be reversed if "* * * substantial rights of the petitioner have been prejudiced. * * *."

III. The question then becomes whether substantial rights of the department of social services have been prejudiced. Section 17A.19(8), The Code. The commission and trial court both determined no substantial rights were prejudiced. This determination followed the commission's acceptance of the intervenor's claim that classification can be distinguished from job duties and functions. Intervenor again urges on appeal the priva-

cy rights of inmates can be a justification only for limitations placed on job functions but cannot form the basis for job classification. But a job classification is a description of its component parts. It is made up of its duties and functions. Moreover, under the law, a position classification must be "* * * based upon duties performed and responsibilities assumed. * * *." Section 19A.9(1), The Code. Accordingly, the commission's rules define a "class" as "one or more positions, which are sufficiently *similar in duties and responsibilities,* that each position in the group can be given the same job title, require the same minimum qualifications as to education and experience, can be filled by substantially the same test of ability or fitness, and that the same schedule of pay can be applied with equity to all positions in the class *under the same or substantially the same employment conditions.*" (Emphasis added.) Section 570–1.1(8) I.A.C. The same rules define "classification plan" as "* * * the orderly arrangement of positions within the classified service into separate and distinct classes, so that each will contain those portions *which involve substantially similar* or comparable skills, duties, and responsibilities." (Emphasis added.) Section 570–1.1(10) I.A.C.

▪ We come then to the central and fighting issue in this suit. Are the duties which the intervenor cannot perform crucial to her job classification? If not the commission and trial court were right in ordering the intervenor to be classified as CO II and at the same time exempting her from performance of those duties. We fully recognize and subscribe to the goals of the Iowa Civil Rights Act of 1965 and the Merit System Act. At the same time we think it is more than apparent that, under the facts in this case as found by the commissioner, the duties the intervenor cannot perform are the very core and substance of the CO II classification.

The commissioner's findings of fact were supported by the record. They can be summarized as follows:

a. Cell houses and other areas frequented by CO II's are places where bodily functions are performed and showers taken in full view of correctional officers at all times.

b. By reason of the physical arrangement at the reformatory, the spacing of buildings, towers, etc., there are places which cannot be observed from towers or by other means so that correctional officers on general duty are frequently alone with inmates. Even where more than one officer is on duty in an area the officers are normally not in view of one another.

c. Daily required "pat searches" of inmates are an essential duty of a CO II.

d. Strip searches are frequent and, although usually two officers are present, one could not be a woman.

e. No place in the reformatory could be considered safe from danger. A female would be more subject to an assault, especially a sexual assault.

f. Surprise is essential for a correction officer. To announce a correctional officer's presence in order to avoid embarrassment of inmates would eliminate this important factor for effective performance.

g. It would be economically unsound, would present serious scheduling problems, would destroy essential flexibility in the assignment of CO II's, and cause discontent among male CO II's to limit the functions of a female CO II.

j. The question of invasion of the privacy of inmates by a female CO II is so serious it could cause protest if females worked in certain areas. This would lead to serious confrontation if the protests were ignored. Male inmates have fixed ideas as to female roles. Confrontations and testing are certain to be frequent.

k. The inmate population at the reformatory has a greater tendency to violence than does the general population. Inmates react spontaneously with little thought of consequences and without mature judgment. Anything which upsets the balance ignites these factors, affects the rehabilitation program, and requires countermeasures (which always take time) in order to get things back to normal.

1. There have already been inmate protests concerning their privacy because the intervenor worked in the tower. This example of the reactions of the male inmates is typical.

From the findings we conclude it is impossible to separate the CO II classification from the duties the intervenor cannot perform. A CO II is an officer whose essential function, though flexible, demands the closest personal contact with reformatory inmates. Physical contact and intimate surveillance are essential and common. It is apparent that the basic distinction between CO I's and CO II's lies in the ability of CO II's, by such personal contact, to bring the authority of the institution to bear directly on the person of each inmate. This conclusion is supported by the fact some CO II's, because of advancing age, or fear, voluntarily take demotions to a CO I classification, and "sit it out on the tower before they retire."

We do not believe the institution should be required to substantially adjust its physical plant or procedure in order to support the imposition of a classification. The following from *Long v. California State Personnel Board, supra,* 41 Cal.App.3d at 1015, 116 Cal.Rptr. at 572 (3 Dist. 1974) is pertinent:

"Argument was presented and even evidence to the effect that physical adjustments could be made to prevent these incidents. [Potential sexual attack on a woman chaplain by male prisoners.] Security guards could be hired, alarm systems could be expanded, buildings could be moved, and procedures changed. However we do not view the duty of an employer to refrain from discrimination based upon sex as requiring him to alter substantially his facility and procedure to suit the sex of the person involved. Certainly reasonable adjustments should be made, otherwise equal protection rights of either sex could be thwarted by contrived nonsensical conditions."

Under the closely similar federal civil rights acts, 42 U.S.C. 2000e–2(e), a discriminatory practice cannot be justified by administrative convenience, *Schaefer. v. Tannian,* 394 F.Supp. 1128, 1134 (E.D.Mich. 1974), or in the private sector by a "business purpose." *Robinson v. Lorillard Corporation,* 444 F.2d 791, 796–797 (4 Cir. 1971). On the other hand it is permissible to discriminate on the basis of sex on the ground of "business necessity", that is, where the practice is "necessary to the safe and efficient operation of the business." *Robinson, supra,* 444 F.2d at 797–798. The civil rights act permits reasonable classifications of employees based on sex, and an employer is required to neither pattern a job for a woman or a man, nor accept an inefficient mode of operation. 14 C.J.S.Supp. Civil Rights § 68, p. 120 (1974). See *Dothard v. Rawlinson,* —— U.S. ——, ——, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786, 799 (1977) n. 14.

We hold the decisions of the commission and the trial court prejudice the department's substantial rights and were spawned by an erroneous understanding of the law.

IV. Last we must determine whether to remand the cause for further proceedings. It is suggested further proceedings would be appropriate, in the light of our determination of the foregoing, and especially in the light of the decision in *Dothard v. Rawlinson, supra.* But we do not believe the cause should be remanded. Under the established and undisputed facts in the case, and the legal principles hereinbefore discussed, the department should not be required to classify the intervenor as a CO II. The judgment of the trial court is hereby reversed.

REVERSED.

All Justices concur except UHLENHOPP, J., who dissents in which McCORMICK, J. joins, and REYNOLDSON, J., who dissents.

UHLENHOPP, Justice (dissenting).

The question is not whether *this court* should hold that women may work in male prisons. Rather, the question is whether this court should overturn the decision of the responsible *administrative agency* on that issue. I part company with the court

majority over the role of this court vis-a-vis the role of the administrative agency.

In 1967 our legislature enacted the Merit System Act creating the Iowa Merit Employment Department under the general jurisdiction of the Merit Employment Commission. That department through the commission is the agency charged with administering the merit employment laws which protect covered state workers such as Gunther. 62 G.A. ch. 95 (Code 1977, ch. 19A). One of those laws prohibits discrimination in employment practices on account of sex, in the following unequivocal language in § 18 of chapter 95 (Code 1977, § 19A.18):

> No person shall be . . . in any way . . . discriminated against with respect to employment in the merit system because of his . . . sex . . . . .

In 1969 the legislature further strengthened the Merit System Act by adding this section:

> The provisions of this Act including but not limited to its provisions on employees and positions to which the merit system apply, shall prevail over any inconsistent provisions of the Code and all subsequent Acts unless such subsequent Acts provide a specific exemption from the merit system. 63 G.A. ch. 79, § 8 (Code 1977, § 19A.22).

The legislature authorized the Merit Employment Commission to hold hearings and render decisions in administering the act. 62 G.A. ch. 95, § 14 (Code 1977, § 19A.14). The commission accordingly promulgated rules for such hearings and decisions. 570–Ch. 15(19A) IAC. Both the act and the rules provide for appeal to the courts under the Administrative Procedure Act (chapter 17A of the Code). 62 G.A. ch. 95, § 14 (Code 1977, § 19A.14); 570–15.4(19A) IAC.

The existing rigid employee classification system at the Reformatory in fact freezes women in the lowest class, Correctional Officer I. Gunther challenged this system and proceeded through the proper steps prescribed by the commission's rules to a hearing and decision by the commission, which held for her. The commission found that women can perform some functions in the Reformatory, and that the Reformatory may not impose an inflexible employee classification system which prevents Gunther and other qualified females from advancing from Correctional Officer I to Correctional Officer II, and so on up the ladder. The commission did, however, include a sensible exception for functions involving undue compromise of residents' bodily privacy or unreasonable hazard. The Reformatory as the appointing authority appealed to district court under the Administrative Procedure Act from the commission's decision. That court affirmed. The Reformatory then appealed to this court, as the Administrative Procedure Act also permits. Gunther did not by cross appeal challenge the exception relating to invasion of privacy or undue hazard.

The judicial review in district court and in this court permitted by the Administrative Procedure Act is not de novo; on the contrary, it is restricted. See *Hoffman v. Iowa Dep't of Transportation*, 257 N.W.2d 22 (Iowa). Under that act, courts may intrude upon agency action only if substantial rights of the petitioner have been prejudiced because the agency action is

a. In violation of constitutional or statutory provisions;

b. In excess of the statutory authority of the agency;

c. In violation of an agency rule;

d. Made upon unlawful procedure;

e. Affected by other error of law;

f. In a contested case, unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole; or

g. Unreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. Code 1977, § 17A.19(8)(a)–(g).

If the commission, in the face of the unequivocal statutory proscription on sex discrimination in public employment, had held against Gunther, we would have a

difficult case. Then quoted subparagraph *a* in the Administrative Procedure Act—violation of statutory provision by the commission—would squarely confront us. But the commission held for Gunther and enforced the proscription.

I have examined subparagraphs *a* through *g* of § 17A.19(8) and cannot find any subparagraph which permits the courts to intervene here. The commission did not in its decision violate a statutory provision; rather, it carried out the command that "No person shall be . . . in any way . . . discriminated against with respect to employment . . . because of his . . . sex . . . ." 62 G.A. ch. 95, § 18 (Code 1977, § 19A.18); see *Reynolds v. Wise*, 375 F.Supp. 145 (N.D.Tex.). Certainly the commission did not contravene a constitutional clause; on the contrary it implemented the guarantee that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.Amend. XIV, § 1; see *Dothard v. Rawlinson*, —— U.S. ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 n. 20 (U.S.). It did not violate residents' constitutional right of privacy, for it excepted assignments "to assure inmate privacy." The commission did not exceed its statutory authority; its very function is to carry out the provisions of the Merit System Act as it did here. Nor did the commission violate an agency rule, employ improper procedure, or apply an erroneous rule of law. The rule of law involved is the statutory proscription on sex discrimination, which the commission enforced.

As to subparagraph *f* ("unsupported by substantial evidence") and subparagraph *g* ("unreasonable, arbitrary and capricious" or "abuse of discretion"), substantial evidence shows that women can perform some of the tasks in the Reformatory, and the commission did not rule that women be allowed to do everything—it made an exception regarding privacy and hazards. With these exceptions the ruling is well within the evidence and neither unreasonable nor in excess of the commission's discretion. Indeed the Reformatory's own psychologist admitted on the stand, "I would say that I think it would be much more advantageous

if we had a setting where we could provide adequate security to women so that we could employ more women in various areas and I think that having men interact with more women in a secure way would be of much greater benefit to rehabilitation than the current situation." Since the commission carried out the statutory anti-discrimination language here, the only way I can see for calling the commission's decision "unreasonable, arbitrary and capricious" is by holding the statute itself unreasonable, arbitrary, and capricious, yet I do not understand that the Reformatory challenges the validity of the statute.

The temptation is subtle and strong for judges to decide themselves whether females should be appointed correctional officers. But we should not enter upon the question of the wisdom of opening up employment to women in male correctional institutions, for that decision has not been confided to us. Employment in the Reformatory is public employment and the whole problem of sex discrimination in public employment has been entrusted by the legislature to the commission, functioning under the unequivocal mandate of the Merit System Act. We should not thwart the commission in its effort to execute the enjoinder of the act.

Thus I would not interfere with the legislatively designated body in its handling of the present discrimination problem. See Davis, Administrative Law Text, § 30.04 at 549–551 (3rd Ed.). I would instead uphold the affirming judgment of the District Judge.

McCORMICK, J., joins this dissent.

REYNOLDSON, Justice (dissenting).

If there is an intimation in the majority opinion a female should be denied employment in any position because of personal danger to her, I disagree.

I do agree with the majority the present employment of a female in a CO II position at Iowa Men's Reformatory would involve an invasion of the inmates' constitutional

right of privacy. I also agree the duty "exemptions" granted by the commission would create still another irrational classification in a system which, at least as it relates to this department, is riddled with inconsistencies.

Confronted by these circumstances, I would reach a different disposition of this appeal. On this record it is impossible to reach a fair and rational result for either Gunther or the department. Present classifications fail to reflect not only necessary BFOQ exceptions, but the duties and responsibilities undertaken by those in the same classifications in various institutions under the department. See § 218.1, The Code.

There is evidence in the record there are no male guards classified CO II at the women's reformatory. There are women employees "kept in a protected situation" but classified CO II at the state penitentiary (for men). The sex, classifications, duties and responsibilities of correctional officers at correctional release centers and camps were not the subject of testimony in this case. Similar anomalies may be present there.

The commission assigns some blame to the department for this situation, but concedes its own unfulfilled responsibility to clarify institutional job classifications. This duty is imposed on the commission by statute, § 19A.9(1), and under its own rule 570–3.1(4), I.A.C.:

"The commission through co-ordination with, and the co-operation of, the agencies shall from time to time review the classification plan and may add, combine, divide or abolish classes or revise the specifications of existing classes or establish new classes as the needs of the classified service so indicate. * * * "

Any attempt to assign Gunther to a classification in these circumstances would be a temporary expediency at best.

The decisions below prejudiced the department's substantial rights and flowed from an erroneous concept of law. As a result this court is authorized to grant wide-ranging relief, including power to "re-verse, modify, or grant any other appropriate relief from the agency action, equitable or legal and including declaratory relief." § 17A.19(8), The Code.

I would reverse and remand this case to the commission for ultimate decision following reclassification and opportunity for each party to present additional evidence. This decision should be rendered in light of the following considerations:

1. The decision in *Dothard v. Rawlinson*, —— U.S. ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

2. The reality that in appropriate situations there must be BFOQ exceptions recognizing prisoners' limited rights of privacy.

3. The precept that all merit system employees should receive equal pay for equal work and this cannot be achieved by permitting departments or agencies unlimited freedom in classifying positions and developing pay plans. *Peters v. Iowa Emp. Security Com'n*, 235 N.W.2d 306, 310 (Iowa 1975); see last paragraph of § 19A.3, The Code.

4. To the extent the same are not nullified by § 17A.22 as inconsistent laws, the right of the director of the division of corrections to perform those duties prescribed in § 217.14(1), (2), (3) and (4); the right of the directors of the particular correctional institutions to recommend management rules, § 218.4; and the right of the division director to "classify the officers and employees into grades," § 218.13.

5. The complex and difficult realities of running a penal institution, and the wide-ranging deference to be accorded the opinions and decisions of prison administrators, *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125–128, 97 S.Ct. 2532, 2538–2539, 53 L.Ed.2d 629, 638–640 (1977).

6. The precept that when employees of either sex are protected by selective duties under a broad classification which inevitably imposes on employees of the other sex more dangerous or onerous duties and responsibilities such practice not only violates the equal pay—equal work concept, it is reverse sexual discrimination violating § 19A.18.

Under the disposition suggested here, if Gunther ultimately were held entitled to a higher classification, or higher pay grade within her present or a comparable classification, provision could be made for retroactive payment of her rightful salary.