**Cynthia GUNTHER, Plaintiff,**

v.

**IOWA STATE MEN'S REFORMATORY and Victor Preisser, Commissioner of the Iowa Department of Social Services, Defendants.**

No. C 77–73.

United States District Court,
N. D. Iowa,
Cedar Rapids Division.

Jan. 5, 1979.

Gordon E. Allen, I.C.L.U., Des Moines, Iowa, for plaintiff.

Richard C. Turner, Atty. Gen., Stephen C. Robinson, Special Asst. Atty. Gen., Des Moines, Iowa, for defendants.

## ORDER

McMANUS, Chief Judge.

This matter is before the court on the parties' cross-motions for summary judgment filed by plaintiff August 21, 1978 and defendant August 28, 1978, and plaintiff's

unresisted motion to substitute Victor Preisser as party defendant in place of Kevin Burns, pursuant to FRCP 25(d)(1). Plaintiff's motions granted; defendants' denied.

## Background

In September, 1974 plaintiff was employed as a Correction Officer I (COI) at the Iowa State Men's Reformatory[1] at Anamosa (Anamosa) having qualified by education for the position of Correction Officer II (COII). After working as a COI she applied for a promotion to COII status which was denied on the basis of sex.

As a COI she has performed some duties also performed by COII's and has not been able to do all duties of a COI because of her sex. She requested special training in riot control and self-defense which was available to male officers and was turned down.

After her request for promotion to COII was denied, she filed a grievance with the Iowa Merit Employment Commission which found that she was entitled to promotion. The state appealed to the Iowa District Court in and for Polk County which upheld the commission's ruling. In December, 1977 the Iowa Supreme Court overturned the administrative ruling and lower court decision and found that under Iowa law there existed a bona fide occupational qualification exception (bfoq) on which the state could premise COII classification according to sex.

This complaint was filed prior to the Iowa Supreme Court's ruling and pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e[2] *et seq.* Plaintiff claims she was denied promotion solely because she is a woman and that there exists no bfoq which would justify sex discrimination.

Defendants' motion for dismissal on grounds of res judicata was denied on the basis that while similar, the state and federal laws dealing with sex discrimination create separate causes of action and may be subject to different standards. In addition, the time schedule established by Title VII prevented the Commission's case and plaintiff's from being consolidated. While respecting the state court's findings and conclusions, this court is bound to consider the facts independently in light of federal law.

The parties have submitted this case on cross-motions for summary judgment to be decided on the record before the commission and judicial tribunals.

The single issue to be decided is whether Iowa's rules preventing women from obtaining jobs above the Correction Officer I level at the Men's Reformatory at Anamosa fall within the "extremely narrow" bfoq exception to Title VII's general prohibition against sex discrimination. Title VII § 703(e), 42 U.S.C. § 2000e–2(e).[3] *See Do-*

---

1. Like most penal institutions in this country, the Iowa Men's Reformatory at Anamosa is segregated by sex and housed 722 men in June, 1975. The great majority of inmates live in galleries in two cell houses where bodily functions are performed in open view of the guards and other inmates.

 About one-third of the inmates were serving time for violent crimes. Approximately 3.3 per cent of the total inmate population were convicted rapists.

2. 42 U.S.C. § 2000e–2(a) states:

 It shall be an unlawful employment practice for an employer—

 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

3. In relevant part, 42 U.S.C. § 2000e–2(e) states:

 Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

*thard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

Title VII was meant to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). A number of standards have been proffered for determining whether a bfoq exists. However, the federal courts are in agreement that refusing to hire a woman on the basis of stereotyped characterizations is prohibited. *See Dothard, supra,* 433 U.S. at 333, 97 S.Ct. 2720 and citations at n.17.

At the outset it is necessary to distinguish this case from *Dothard, supra* which involved the Alabama prison system, characterized by federal district court judge Frank M. Johnson as "horrendously overcrowded", "dilapidated", "filthy", and one of "rampant violence" and "inhuman conditions" which makes it constitutionally intolerable. *Pugh v. Locke,* 406 F.Supp. 318, 323–325 (M.D.Ala.1976) modified in part 559 F.2d 283, *cert. granted* remanding on other grounds and dismissing state parties, —— U.S. ——, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The Supreme Court painstakingly limited its decision upholding a male bfoq in the Alabama penitentiaries to that "peculiarly inhospitable" environment. Anamosa is no rose garden; neither is it the stygian spectre which faced the Supreme Court in *Dothard.*

Although *Dothard* is distinguishable on the basis of differences between prison conditions and inmate populations in Alabama and Anamosa, it provides an analytical framework for assessing the proffered bfoq in this case. The Supreme Court rejected the usual policy which would allow each woman to determine for herself whether to risk the potential consequence of taking a contact position within a prison, and instead employed a balancing test which weighs Title VII rights against the possibility and probability of disruption of the prison system.

That balancing test would seem applicable to all prison contexts. However, the probabilities of sexual assaults on female correction officers at Anamosa and the potential impact on prison discipline and rehabilitation opportunities is not of the degree as would warrant an exception to Title VII's proscriptions. The Supreme Court was considering a brutal, jungle-like maximum security environment in Alabama. Defendant's witness Calvin Auger, the warden at Anamosa, classified his institution as a medium security facility. In balancing the plaintiff's rights against institutional stability—an important and legitimate goal—the Supreme Court has mandated that courts and administrative bodies weigh probabilities of instability. In *Dothard* the balance tipped toward recognizing a bfoq. In this case it tips toward recognition of plaintiff's rights.

In the case at bar defendants have admitted discriminating on the basis of sex. Thus a prima facie case of discrimination has been established and it becomes the defendants' burden to show that the sex-based requirement has "a manifest relationship to the employment in question." *Griggs v. Duke Power Co., supra* at 432, 91 S.Ct. at 854; *Knott v. Missouri Pac. R. Co.,* 527 F.2d 1249, 1251 (8th Cir. 1975).

Defendant has repeatedly asserted that placing women in contact positions within the institution would: (1) violate prisoners' privacy rights; (2) jeopardize prison security and rehabilitative programs; (3) put the guards, both male and female, in increased danger; and (4) lead to major disciplinary problems. In addition, they claim that allowing women to achieve COII status and fashioning a rotation to avoid placing them in dangerous areas or in areas where inmate privacy must be maintained would be unfair to male officers and would create serious administrative problems.

Plaintiff acknowledges that assignment to certain duties would create a privacy

problem.[4] Although she initially requested general COII duties she now does not seek assignment to areas which would require surveillance of prisoners while they take showers or use toilet facilities. Nor does she request assignments which would require her to strip search inmates.

■ Whether a legitimate bfoq exists depends on the answers to three closely interrelated questions which generally address the issues of whether a bfoq is reasonably necessary for the proper administration of the institution:[5] (1) Would the essence of the institution and its goals be undermined by not hiring men only? (2) Is there reasonable cause to believe, that is a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job? and (3) Would any personnel adjustments caused by hiring female COII's substantially impinge on the efficient and effective operation of the facility? The state urges all questions be answered in the affirmative. The court agrees with plaintiff that each should be answered "no".

*Essence of Prison Administration*

Security and order are essential. Surveillance of inmates in the cell blocks and shower rooms appears to be important to these goals.

**4.** The question of inmate privacy is not so clearly answered as defendants assert. Prisoners' constitutional rights survive incarceration but are subject to requirements of order and security. See *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Constitutional rights must be balanced against "legitimate penological objectives of the corrections system." *Id.* at 822, 94 S.Ct. at 2804.

Here defendants seek to raise prisoners' privacy rights which certainly are not those enjoyed by private citizens in an open society. It is not clear that these rights may be raised by defendants except as they relate to order and other legitimate purposes of the institution. Such privacy is not so much an objective commodity as it is a subjective concept to be measured by the administration's perception of the impact of female COII's working in areas which require monitoring toilet and shower facilities. On this record there is only speculation as to how inmates would react to a woman under such circumstances, and how reaction, if any, would affect legitimate goals. If a ruling were based on privacy interests further proceedings would be required. However, it is unnecessary to reach the privacy question as plaintiff seeks only COII classification with limited functions and this court believes that such classification is required in these circumstances.

The issue of privacy rights per se is best reserved to a case in which they are raised fully by proper parties. For the present it is enough to note that in an environment such as that at Anamosa where prisoners live in various degrees of exposure, are often viewed by guards while showering and excreting, and are in constant view of their fellow inmates, privacy already has been seriously eroded.

In addition, mores as to being viewed naked by members of the opposite sex under certain circumstances are bound to change as women become further integrated into the occupational and professional world. See *Dothard v. Raw-*

linson, 433 U.S. 321, 346 n.5, 97 S.Ct. 2720, 53 L.Ed.2d 786 (Marshall, J., dissenting). The traditional rule that only male guards may view male inmates under these conditions may derive from just the type of stereotypical value system condemned by Title VII.

The court is familiar with the cases cited by defendants and the Supreme Court of Iowa in *Iowa Dept. of Social Serv. v. Iowa Merit Emp. Dept.,* 261 N.W.2d 161, 165 (Iowa 1977) but believes each is factually distinguishable. This is not a case of potential infringement of a clothing customer's privacy as in *Hodgson v. Robert Hall Clothes, Inc.,* 326 F.Supp. 1264, 1269 (D.Del.1971). Nor is this a question of who will perform a search of a body cavity without at least "a real suspicion" that a private citizen crossing a border is concealing contraband. See *Henderson v. United States,* 390 F.2d 805, 807–808 (9th Cir. 1967). Neither are prisoner's privacy rights analogous to those of a female complainant in an assault case who is required to be photographed nude by a male police officer who then developed and printed the pictures and distributed them to other police officers. See *York v. Story,* 324 F.2d 450 (9th Cir. 1963). The California and Pennsylvania state court cases cited either are questionable as to application of federal law, [see *Long v. California State Personnel Board,* 41 Cal. App.3d 1000, 116 Cal.Rptr. 562 (1974)] or based on facts peculiar to youth authority facilities [*In re Long,* 127 Cal.Rptr. 732 (Ct.App.1976); *City of Philadelphia v. Pennsylvania Human Relations Commission,* 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973)].

**5.** As the Fifth Circuit Court of Appeals stated in *Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir. 1971), the statute requires a "business *necessity* test, not a business *convenience* test." (Emphasis in original). See also *Weeks v. Southern Bell Telephone & Telegraph Company,* 408 F.2d 228, 235 (5th Cir. 1969).

Plaintiff admits that assigning female officers to shower and cell surveillance might constitute an invasion of inmate privacy. The Iowa Supreme Court concluded that full time surveillance constitutes the core of the institution's functions and that adjustments which would mitigate the privacy problem and allow women to perform limited COII functions could not be imposed under the Iowa Civil Rights Act or Merit System Act. Title VII dictates otherwise. Privacy is certainly to be respected but the essence of the facility is not a function of having all personnel available to work in all areas. Balancing the federal right not to be discriminated against in employment against the administrative inconveniences of functional scheduling dictates institutional adjustments which will not substantially affect the efficient operation of the facility or undermine its essential functions. Administrative inconvenience cannot justify discrimination. *Schaefer v. Tannian*, 394 F.Supp. 1128, 1134 (E.D.Mich.1974). *See Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

In this context, adjustments may be made without jeopardizing privacy rights of prisoners or disrupting efficient management or core goals. There are a substantial number of jobs within the facility which can be performed by a qualified female COII just as well as by a qualified male. Accepting defendants' claims of a need for flexibility among staff members, it is difficult to imagine emergency situations in which trained women would not be able to function. Of course, the area of inmate strip searches may be left to male officers. *But see* note 4, *supra*. Any inconvenience in scheduling cannot outweigh plaintiff's rights. In addition, it is noted that women hold positions as COII's at the state's maximum security facility at Fort Madison, though they perform limited and non-contact duties.

### Safe and Efficient Performance

Testimony established that any officer, male or female is equally subject to assault. Sexual assault on female officers may be of higher probability than for males. However, as far as impact on prison discipline is concerned, an assault is an assault. A sexual assault would only be more destructive if of its very nature it led to major disruption. There is no evidence to support that possibility. The experience of using female officers in contact positions in other state and federal prisons indicates that the fears voiced by the state and state Supreme Court are highly speculative and based on stereotypical views of "macho" roles among prisoners and a woman's inability to cope with the psychological and physical problems inherent in a prison environment. *See Dothard, supra,* 433 U.S. at 341, 97 S.Ct. 2720 (Marshall, J., dissenting).

### Institutional Adjustments

The state contends that adjusting assignments so that women can qualify for COII positions in non-privacy areas would be economically and administratively unsound and unfair to male co-workers who perform the gamut of COII duties. None of these reasons, alone or aggregated, is grounds for denying women their right not to be discriminated against in employment opportunity. The state has adjusted its work schedules so that certain men at Anamosa have remained at a single job under COII status for up to three years. Defendants' witnesses admitted that none of the other COII's have complained. At any rate, if complaints of fellow workers were grounds for a bfoq, Title VII could be gutted by the gripes of entrenched employees. Clearly job assignment adjustments within the facility in the past have not undermined its essential goals or functions. While there may be a valid reason to limit certain of the functions of female correction officers, there is no legal reason to cut them off completely from COII classification and the opportunities that classification offers. With the proper training (already offered to male employees) female officers should be as able as their male counterparts to deal with everyday problems and emergencies.

To state, as do defendants, that if women cannot qualify for contact positions and the

necessary training, they will not have the experience to deal with contact problems, is tautological. Only those who cling to impermissible and outdated stereotypes can believe that a well trained, committed female corrections officer could not deal with problems at this particular facility on a par with her male counterparts. Emergencies would not generally involve privacy problems and it should not be a hardship for male correction officers to conduct necessary strip searches of male inmates. Plaintiff already performs such searches on female visitors.

Summary judgment under FRCP 56 is available where the overall record establishes that there is no genuine issue of material fact, and that one party is entitled to judgment as a matter of law. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail,* 430 F.Supp. 1234, 1237 (N.D. Iowa 1977) affirmed in part, reversed in part on other grounds, 578 F.2d 1256 (8th Cir. 1978).

■ Each party has made its record as to the nature of the facility, potential impact of allowing women to perform contact jobs, and the relative abilities of males and females in performing those duties. No genuine issues of material fact remain outside the record which would prevent summary judgment. Defendants have patently failed to bear their burden of proving that a bfoq was reasonably necessary to the normal operation of the Iowa State Men's Reformatory at Anamosa or that denial of a bfoq would create a reasonable possibility of a breakdown of the legitimate governmental interests discussed above. *See Procunier v. Martinez,* 416 U.S. 396, 413–414, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

Similarly, defendants have failed to show that there are no reasonably available alternative practices with less discriminating impact that would satisfy the legitimate needs of the institution. *See Green v. Missouri Pacific Railroad Company,* 523 F.2d 1290, 1298 (8th Cir. 1975). In fact functional assignment within the COII classification is just such an alternative.

It is therefore

ORDERED

1. Motion to substitute parties granted.

2. Plaintiff's motion for summary judgment granted.

3. Defendants' motion for summary judgment denied.

4. Defendants are permanently enjoined from engaging in further acts of discrimination against plaintiff on account of her sex.

5. Plaintiff shall be promoted as of the date of this order to rank of Correctional Officer II with all rights, benefits, training and salary thereof. Award of salary and other benefits will be made retroactive to a date still to be determined by this court, unless by January 19, 1979 the parties stipulate as to those damages. In the event no stipulation is agreed upon, the parties shall submit briefs and affidavits by January 26, 1979 as to the dates on which, after completing work as a COI, plaintiff requested and was denied COII classification. Final judgment will be entered upon resolution of the damages issue.

6. Attorney's fees will be awarded pursuant to 42 U.S.C. § 2000e–5(k). Plaintiff shall submit by January 26, 1979 affidavits detailing such fees. Defendant shall have until February 9, 1979 to respond.