Jennie M. GRIFFIN and Constance M. Anderson, on behalf of themselves and on behalf of all others similarly situated, Plaintiffs,

v.

MICHIGAN DEPARTMENT OF CORRECTIONS; Perry Johnson, Director of Michigan Department of Corrections; Jack Boyett, Personnel Director, Michigan Department of Corrections; Charles E. Anderson, Regional Administrator for the State Prison of Southern Michigan; William F. Grant, Deputy Warden for the State Prison of Southern Michigan; Raymond H. Kraft, Personnel Director, State Prison of Southern Michigan; Dale Foltz, Administrator of the Michigan Reformatory in Ionia, Michigan; Michigan Civil Service Commission; James Miller, Chairman of the Michigan Civil Service Commission; and Richard Ross, State Personnel Director, Defendants.

Civ. A. No. 80-71516.

United States District Court, E.D. Michigan, S.D.

Nov. 12, 1982.

Kurt Beggren, Ann Arbor, Mich., for plaintiffs.

Elaine Dierwa Fischoff, Asst. Atty. Gen., Detroit, Mich., for defendants.

## MEMORANDUM OPINION

JULIAN ABELE COOK, Jr., District Judge.

This Memorandum Opinion constitutes the Findings of Fact and Conclusions of Law by the Court, as required by *Fed.R. Civ.P.* 52.

### I. PARTIES

Plaintiffs, Jennie M. Griffin [Griffin] and Constance M. Anderson [Anderson], are citizens of the State of Michigan. Griffin is a female corrections officer at the State Prison of Southern Michigan in Jackson, Michigan [Jackson]. Anderson is a female corrections officer at the Michigan Reformatory in Ionia, Michigan [Ionia].

This is a Rule 23(b)(2), (3) class action. The Plaintiff class has been certified as "all women employees and correctional officers now working or who have worked at the all-male maximum security institutions in Michigan and who are denied or who have been denied promotional opportunities because of the defendants' policies of not allowing women to work within the housing of residential units."

Defendant, Michigan Department of Corrections [Department of Corrections], is a unit within the State of Michigan government which is responsible for the maintenance of all persons who have been sentenced to terms of incarceration in correctional facilities by the various State courts. Defendants, Perry M. Johnson [Johnson], Director of the Department of Corrections, and Jack Boyett [Boyett], Personnel Director for the Department of Corrections, are responsible for the implementation of all policies, practices, rules and regulations of the entire prison system, including the employment, promotions, salary, seniority and other benefit policies, practices and actions.

Defendants, Charles E. Anderson [Anderson], William F. Grant [Grant], and Raymond H. Kraft [Kraft], hold the positions of Regional Administrator, Deputy Warden and Personnel Director, respectively at Jackson. These three individuals are responsible for all of the employment practices and policies relating to employees at Jackson.

Defendant, Michigan Civil Service Commission [Civil Service Commission], is a State agency which is responsible for the enactment of employment policies and practices for all State employees, including Plaintiffs and the Plaintiff class. Defendant, James Miller [Miller], is Chairman of the Civil Service Commission, and Defendant, Richard Ross [Ross], is the Personnel Director for the Civil Service Commission.

### II. JURISDICTION

Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343, which provides for original jurisdiction in all suits that have been authorized by (1) 42 U.S.C. § 1983 to redress deprivation, under color of State law, of any right, privilege, or immunity that has been secured by the Constitution or laws of the United States, and (2) 42 U.S.C. § 1985 to redress deprivation of the equal protection of the laws which have been caused by the conspiracy of two or more persons.

Jurisdiction is also conferred on this Court pursuant to (1) 28 U.S.C. § 1331 because Plaintiffs have raised substantial federal questions and seek damages in excess of Ten Thousand Dollars, exclusive of interest and costs, (2) 42 U.S.C. § 2000e-5(f)(3) which provides for original jurisdiction of this Court in all suits that arise from Title VII of the Civil Rights Act of 1964, as amended by the Equal Employ-

ment Opportunity Act of 1972, and (3) the Civil Rights Attorney's Fees Act of 1966, as amended, 42 U.S.C. § 1988. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Rule 57 of the *Fed.R. Civ.P.* relating to declaratory judgments.

## III. PROCEDURAL HISTORY

On April 15, 1980, Plaintiffs filed their Complaint with this Court, seeking, *inter alia*, compensation "... for money damages, back pay, rights to seniority and other benefits, as well as declaratory and injunctive relief." In their Complaint, Plaintiffs charge that "Defendants have systematically and continuously discriminated against women correctional officers at all male prison facilities in the State of Michigan." They further allege that "there is a pattern of practice by the Defendants to harass, intimidate and punish ... Plaintiffs and other members of ... Plaintiff class for filing complaints and grievances and otherwise attempting to remedy this unlawful discrimination." Plaintiffs seek (1) "to have this court declare ... [D]efendants' policies, practices and actions invalid, and to enjoin, preliminary and permanently, ... [D]efendants from unlawfully, illegally and unconstitutionally discriminating against women employees and correctional officers in the Michigan prison system ... [and (2) Defendants'] practices declared unlawful and ... to enjoin their further utilization, as well as compensatory damages, for the defendants' illegal actions." They also ask for punitive damages from those Defendants who have "willfully, maliciously and intentionally harmed" them.

On May 13, 1980, Defendants filed a Motion to Dismiss, which was subsequently denied. On June 13, 1980, Plaintiffs filed a Motion for Preliminary Injunction with this Court which was also denied. On October 14, 1980, Plaintiffs filed a Motion for Class Certification. On January 5, 1981, this Court certified the class, pursuant to a Stipulation of the parties. The non-jury trial, which began on January 20, 1981, concluded on January 28, 1981. During the course of the trial, Plaintiffs produced twelve witnesses, and Defendants produced five witnesses. Plaintiffs and Defendants introduced fourteen exhibits, respectively, into evidence. The matter is now before this Court for a final determination.

## IV. UNCONTESTED FACTS

The parties have not stipulated to any substantive facts for the purpose of this trial.

## V. FINDING OF FACT

The instant controversy surrounds the claims of Plaintiffs, Griffin and Anderson, as well as the claims of the Plaintiff class who contend that they have been subjected to employment discrimination on the basis of their sex by Defendants at three of the correctional facilities within the Michigan penal system (Jackson, Ionia and the Marquette Reformatory [Marquette]).

### A. Employment Units

#### (1) Introduction

There are two basic employment units within each of the three penal institutions that are involved in these proceedings; to wit, Housing and Custody.

#### (2) Housing

Within the Housing unit, there are six major positions (all on a grade level of 08 or higher), the description of which are listed below:

#### (a) Resident Unit Aide IVB [RUA IVB]:

Works directly with prisoners, and is required to (1) patrol the residents' quarters, (2) "[maintain] the proper standards of care and personal hygiene among the residents, [and (3)] maintain an active awareness of the resident unit's activity through periodic resident counts, investigating of suspicious or unusual situations, or the preventing of unauthorized activities."

*(b) Assistant Resident Unit Manager VB [ARUM VB]:*

Participates in a variety of paraprofessional supportive counseling and custodial activities involving the treatment, evaluation, security and disposition of residents in the housing units of state correctional facilities, and service as supervisors of resident/client care staff. This classification is the first-line supervision classification for employees within the dormitories.

*(c) Assistant Resident Unit Manager VI [ARUM VI]:*

Carries out the activities of a housing unit treatment program, serves as a first-line supervisor with responsibility for directing the work activities of resident/client care staff in a housing unit.

*(d) Resident Unit Manager V [RUM V]:*

Performs a variety of activities within the dormitories which are designed to (1) assist correctional residents in adapting to prison life, (2) regulate the daily lives of correctional residents, (3) assist in the rehabilitation of correctional residents, and (4) serve as second-line supervisors of residents/client care staff.

*(e) Resident Unit Manager VIB [RUM VIB]:*

Performs the full range of professional unit manager assignments by utilizing methods and techniques that are required to carry out the activities of a resident unit treatment program in the dormitories.

*(f) Resident Unit Manager VIII [RUM VIII]:*

Serves as a second-line supervisor (the highest level position to which selected assignments are made), with the responsibility for planning and directing the work of resident/client care support through lower level supervisors, and exercises considerable independent judgment to adapt and apply the guidelines to specific situations, as needed. Work assignments stem from the implementation of prison counseling program policies to performing such functions as approving leaves, performing service ratings, counseling employees, participating in employee grievance procedures and the hiring and training of personnel.

*(3) Custody*

The major positions within the Custody Unit are Corrections Officer IIB, Corrections Officer III, Corrections Shift Supervisor IV (Sergeant), Corrections Shift Supervisor V (Lieutenant), Corrections Shift Supervisor VI (Captain), and Corrections Shift Supervisor VI (Inspector).

The entry level within the Custody Unit is the Corrections Officer IIB. In order to be promoted to the next level (to wit, Corrections Officer III), an employee must have (a) completed one year as a Corrections Officer IIB, and (b) maintained constant and extensive contact with prisoners. The Department of Corrections has interpreted "constant and extensive" to mean contact with prisoners for at least fifty-one percent of the employee's time.

The Corrections Officer IIB position is on the 06 level. The Corrections Officer III category is at the next level (to wit, 07). The remaining four positions (to wit, Corrections Shift Supervisor IV, V, VI and VII) are grades 08 or above.

*B. Principal Plaintiffs*

Griffin began her employment at Jackson in December 1972. She attained the grade 07 level in July 1975 as the result of a successful grievance hearing. Subsequently, Griffin unsuccessfully sought promotions to the 08 level on several occasions.

As a result of her inability to acquire a desired upward mobility, Griffin filed an administrative class action grievance in November 1978, claiming sex discrimination within the Civil Service Commission. Approximately seven months later (to wit, May 14, 1979), she filed a similar charge of sex discrimination with the Michigan Civil Rights Commission.

Prior to filing her grievance in November 1978, she had never been punished, sus-

pended or reprimanded by Defendants, except for a one-day suspension in 1973 for marrying an ex-inmate. However, shortly thereafter, Griffin claims that she was removed from her "bid" job without reason or explanation and given numerous reprimands, writeups, counseling memoranda, as well as other forms of punishment.

Griffin contends that the reasons for the denial of her promotional opportunities were contained in a memorandum from Kraft who, on June 19, 1979, stated, in part: "Because of the department's position is not using females in the housing units we will not be scheduling you for an interview for these vacancies."

During the latter part of April 1979, she was assigned to the South Gate at Jackson without explanation. On her first day at the South Gate, she received an official two day written reprimand because of her (1) failure to report to the new assignment on time, and (2) refusal to work without a raincoat.

On June 19, 1979, Griffin and a White male officer were involved in an altercation. Although she was disciplined, the White officer did not receive any punishment. A subsequent grievance by Griffin removed the punishment from her personnel record, and resulted in the reimbursement of her loss of two days' pay.

On July 17, 1979, she received a written reprimand for calling one of her supervisors at his home. This disciplinary action was later deleted from Griffin's files by Barry Mintzes [Mintzes], who was the Warden at Jackson at that time, upon her written request. On August 10, 1979, Griffin received a written reprimand for being away from her assignment on August 2, 1979. Mintzes conducted an investigation and determined that the basis for the issuance of the reprimand was in error. Therefore, he revoked the reprimand and deleted it from her records. On September 5, 1979, Griffin was written up once again for an incident involving another White officer. Although she was not disciplined for the incident, it was mentioned in an Interim Service Rating Report (dated September 18, 1979) which evaluated her work performance. This Report was also based, in part, on Griffin's alleged (1) inability to get along with others, (2) refusal to cooperate with fellow employees and supervisors, (3) gross abuse in the amount of time for lunch and breaks, (4) excessive use of the telephone in her assignments area to do her job, and (5) the incidents of June 19, 1979 and September 5, 1979. Griffin ultimately terminated her employment on August 26, 1980, when she was forced to leave on the recommendation of her family physician.

Anderson worked at the Riverside Center [Riverside] in Ionia, Michigan, a treatment facility for the Michigan Department of Mental Health, until January 10, 1976 when it was closed down. As a result, she, among others, was laid off. All of the men, who worked at Riverside, were immediately transferred to Ionia, without the loss of time from work, pay, seniority or other employment benefits. However, the female employees at Riverside, including Anderson, were not transferred and given work assignments for approximately six months.

On November 14, 1979, she filed Complaints with the Michigan Civil Rights Commission and the Equal Employment Opportunity Commission, charging her employer with sex discrimination on the basis of her repeated inability to gain a promotion. After having filed these charges, Anderson claims to have become the victim of a number of false accusations and set-ups, as well as intimidating comments, harassments and threats to terminate her employment. Prior to that time, she had never been reprimanded, or punished, except on one occasion when she received a reprimand which was later removed as the result of a grievance hearing.

In November 1980, Anderson, on the basis of her doctor's recommendation, was forced to leave her job at Ionia and accept a less demanding job at Camp Pontiac, which necessitates a daily round trip of two hundred miles between home and work.

## C. Plaintiff Class Members

Dorothy White [White], who began working within the Michigan penal system in May of 1973, was promoted to the 06 level custody in 1977. Although she was allegedly promised an automatic promotion to grade 07 after successfully completing the Specialist Training School and one year of satisfactory work, White remained at the 06 level despite (1) the absence of any unsatisfactory evaluations or ratings in her file, and (2) the successful completion of the Specialist Training School.

Helen Worthy [Worthy] testified that she has a B.A. in Social Work, although men, with less education, seniority and qualifications, have been routinely promoted above her to the counselor positions. According to Worthy, Kraft told her that "we're not accepting women" when she applied for a 08 counselor position.

Linda Loftus [Loftus] said that she was not promoted to the 07 level in one year, despite having (1) successfully completed the training school, and (2) becoming a "marksman" in her weapons rating.

Kathleen Leslie [Leslie] claims that she was not promoted to a 07 level within the one year, despite having been promised an automatic promotion after that time period had passed. She testified that four male officers, who had the same seniority date as her seniority date, were automatically given their grade 07 promotions after one year. Leslie said that, whereas none of these men had to request resident contact, she was finally able to get fifty-one percent resident contact well after her one year promotion date. Even though all of her evaluations had been good, Leslie did not apply for a 08 position because she does not have the requisite educational background. However, according to Leslie, most of the men, who work inside the housing units at the 08 level, were also without the requisite educational background.

Steve Shephard [Steve] and his wife, Valarie Shephard [Valarie], testified that Steve began working at Jackson on April 4, 1977, and Valarie began working there on April 18, 1977. They attended the Specialist Training School at the same time; however, Steve automatically reached the grade 07 level after one year, whereas Valarie did not. As a result, she found it necessary to file a grievance in order to get a promotion to the 07 level. They both took the test to be promoted to 08 on the same date. Although his test score (86) was eight points less than that of his wife (94), he was promoted to an 08 level in April 1979. On the other hand, she was denied promotion, despite having applied for the 08 position on numerous occasions. Valarie is still working at an 07 level at Jackson. Steve said that he did not have to do anything to reach the 08 level because it came to him automatically as a male after a period of two years. Steve also testified that he had never heard about the fifty-one percent contact (with residents) rule until women began to be hired at the Institution in early 1978. Valarie stated that she (1) has an Associate Degree in Corrections as of December 1974 from the Jackson Community College, and (2) presently needs only one class in order to obtain a Bachelor's Degree in Criminal Justice from Eastern Michigan University. By contrast, her husband has not acquired any post-high school education.

## D. Federal Correctional Facilities

James D. Williams [Williams], Assistant Director of the Federal Bureau of Prisons, testified that female federal correctional officers are allowed to work in all of the housing units, which include open bar cells, as well as closed front cells. He also said that there are low security screens or privacy screens being used in some of the federal prisons which help to protect and assure the inmates of their right to privacy. Williams stated that, in connection with the study that the Federal Bureau of Prisons is in the process of conducting, he and his study team personally visited three maximum security institutions with open cells in California where women worked in the housing units. He said that the States of California, Illinois, Wisconsin and New York had women working within the hous-

ing units in the male maximum security institutions. Williams testified that women work without restriction within the federal correctional system in positions which are similar in their job responsibilities as the RUMs and ARUMs in the Michigan system. He said that there are no restrictions on these female unit managers, who are encouraged to go in and out of the housing units at will. Williams testified that, although women work in the all male maximum security federal correctional institutions, he was not aware of any personal and/or security problems.

### E. State Correctional Facilities

Generally speaking, the housing facilities within all three State correctional facilities consist of cell blocks with open front bars. Toilets are located within the cells, and prisoners dress and undress within the cells.

The cell blocks at Marquette consist of four tiers. The prisoners at this Institution are probably the most difficult residents to manage within the State corrections system. There are approximately eighty prisoners per cell block. Three resident unit aides and two supervisors are assigned to each cell block for the day and afternoon shift. Because of drafts, a curtain has been placed over three-quarters of each cell front. A guard, who makes the rounds, is required to approach each cell, and look directly into each cell through the uncovered portion of the cell front. Chest level opaque curtains have been in use at Marquette for the last several years. These curtains provide some degree of modesty or privacy protection for the inmates.

The cell blocks at Jackson are five tiers high and house between four and five hundred prisoners who are generally over twenty-one years old. Ordinarily, three RUAs, two ARUMs and RUMs are assigned on each cell block for both the day and afternoon shifts. Housing unit employees do not always work within the housing unit because they are often required to escort prisoners to and from work assignments, as well as to and from other places within the correctional facility. However, there is no escort for any prisoner at Jackson unless he is in the detention area. Jackson female correctional officers are allowed to work in the yard and in a housing unit which is maintained in the forty-four bed infirmary. In addition, women are allowed to work the gun towers at Jackson, from which there is a view directly inside the cell blocks.

Ionia inmates are generally twenty-six years of age and under. The Ionia cell block consists of three separate floors with an average of one hundred prisoners per floor. One RUA is assigned per floor. There are two supervisors per cell block.

### F. State Policies and Practices

After consulting directly with the State Department of Civil Service (who must specifically authorize a State agency to selectively promote an individual on the basis of sex), and indirectly with the State Department of Civil Rights and the State Attorney General, the Department of Corrections implemented an official policy in July 1977 which states, in pertinent part:

> Historically, women have been excluded from employment in correctional facilities and as probation and parole officers dealing with male clients, in many cases without justification. As a matter of fairness and equity, women must not be excluded from jobs they are qualified for and capable of performing. Furthermore, the presence of women, where feasible, in correction facilities for males is a healthy influence and contributes to more normal social conditions.

The Department also developed an affirmative action plan in 1977 which it used to make promotions of women to positions outside of the housing unit prior to the issuance of an injunctive order by a State Court on June 22, 1979. The Department also has a transfer policy which allows women who are Corrections Officers III to transfer, and be promoted, to housing unit positions at all correctional facilities other than Jackson, Ionia and Marquette.

All employees, male and female, go to the Specialist Training School, and receive the same training. In 1975, the Training School became mandatory for all housing and custody unit personnel. No tests or other requirements relating to strength, education, markmanship, agility or sensitivity and negotiating techniques are imposed on any Department of Corrections employee.

If a custody unit employee is interested in seeking promotion to the grade 08 level, it is necessary for him/her to go into the housing unit area. A vast majority of positions available at the 08 level and above are within the housing units at Jackson, Marquette and Ionia. Under the present practice, except for working in the housing units, the only other way that women can be promoted to the 08 level is through the custodial positions. As of October 1980, (1) eighty-one of the eighty-two custodial positions were filled by males at Jackson, (2) thirty-eight of the forty custodial positions were filled by males at Ionia, and (3) all thirty-one custodial positions were filled by males at Marquette. At each of these three Institutions, the fifty-one percent "constant and extensive" contact (with residents) rule was in effect. Work within the waiting room, visiting room, gun towers and any work on the midnight shift is not deemed to satisfy the fifty-one percent contact requirement.

### G. Defendants

Brown testified that Department policy enables females to work within the housing units in medium security and minimum security institutions, but not in (1) the housing units at Jackson, Ionia or Marquette, or (2) the positions which involve a strip search as part of the regular routine. He said that his primary concern in keeping women out of housing units at these Institutions was for their own safety, as opposed to the privacy rights of the inmates.

Grant spoke of two incidents of sexual assaults on female employees at Jackson— one involving a teacher and one other incident relating to an attack on a nurse. On one occasion, the Department of Correc-

tions assigned a female employee to a housing unit at Marquette; however, the experiment was abandoned after she was repeatedly pelted with urine and feces while making rounds.

Mintzes, on the basis of his professional training as a psychologist who has worked with convicted sex offenders, as well as his experience as the Chief Administrator at Jackson, opined that special hostility toward women, which is felt by sex offenders, is the major reason why it was not advisable for women to work within the housing units. He said that approximately one-fifth of the inmates at Jackson are sex offenders; however, Mintzes did concede that there are sex offenders at the medium security installations where women are allowed to work within the housing units.

He testified that male prisoners with hostile attitudes toward women are likely to assault female employees and, thereby, create a major security risk for the facility. Mintzes said that Jackson, Ionia and Marquette house hostile prisoners, all of whom have been deemed to be too unmanageable for medium or low security facilities. He said that such individuals frequently have extremely negative attitudes toward women, with a history of violent acts against them. He claims that it would be reasonable to expect that any female employee would be attacked within the housing units at any of the three correctional facilities. While noting that female employees are free to assume such a risk, Mintzes believes that their presence would pose a major security risk to the correctional facility since the State would be required to hire male guards to protect the female guards. However, Mintzes did concede that (1) he had received only one grievance from an inmate concerning the presence of female employees within the housing unit, and (2) there have been no attacks on women correctional officers by inmates at Jackson since he became the Warden in June 1980.

He also noted that the assaults against female employees differ in kind from the assaults against male employees because

the assaults are "sex-linked." By "sex-linked," he means that the assaults against male officers occur within the context of an altercation between the employee and a prisoner, whereas an assault against a female officer is sexual in nature (e.g., rape), and not predictable. Mintzes said that the sex offenders are integrated within the total prison population in the State of Michigan, and not placed in separate cell blocks. It is Defendants' policy that female correctional officers are allowed to work in the resident or housing units in those non-maximum and non-closed security institutions where males, including sex offenders, are incarcerated.

The Defendants have expressed the belief that the recognition of the prisoners' right to privacy is necessary for both security and rehabilitative reasons. As a part of the job responsibilities, RUAs must patrol the prison galleries and make frequent unannounced security checks by looking into each cell. As a consequence, the presence of women in the cell blocks as guards would necessarily place them in a position to observe the prisoners in various states of undress. Being viewed in a state of undress or using toilet facilities by a guard of the opposite sex would be dehumanizing and, in turn, would cause great resentment by the inmates.

Finally, Defendants have steadfastly and emphatically denied having discriminated against any of the Plaintiffs. More specifically, they have denied having violated any of the Plaintiffs' Constitutional rights. While acknowledging that female employees are not allowed to serve in certain sensitive custodial positions, the Defendants insist that the disadvantages (e.g., danger to safety of the female officer, impairment to the security of the correctional institution, and a violation of the inmates' right to privacy), which are inherent in having women in close contact situations with inmates, greatly outweigh all of the advantages which would result from any other alternative solution.

## VI. DISCUSSION OF LEGAL AUTHORITIES

■ Plaintiffs have established that they (1) are females, (2) had applied, and were qualified, for job opportunities at the grade 07 level and above, (3) were rejected for such positions, and (4) thereafter, those positions remained open while the Defendants continued to seek applicants. Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), Plaintiffs have established a *prima facie* case of sex discrimination. Therefore, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for, or a statutory defense to, Plaintiffs' rejection. *See Jurinko v. Edwin L. Wiegend Co.*, 477 F.2d 1038 (3rd Cir.), *vacated and remanded on other grounds*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).

Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e), provides, in pertinent part: Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire an employee ... on the basis of ... religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....

In addition to this statutory exception, the Equal Employment Opportunity Commission issued guidelines which interpret the "bona fide occupational qualification [BFOQ]" exception to sex discrimination. *See* 29 C.F.R. § 1604.2. In pertinent part, those guidelines state:

(a) The Commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly ... (1) the Commission will find that the following situations do not warrant the application of the bona fide occupational qualification exception:

(ii) the refusal to hire an individual based on individual based stereotyped characterizations of the sexes ... the principle of non-discrimination requires that indi-

viduals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group.

(iii) the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers....

In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Court agreed "that the BFOQ exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex," 433 U.S. at 334, 97 S.Ct. at 2729. Due to the narrow interpretation of the BFOQ exception, the burden on Defendant to establish the exception is very heavy, *see Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir.1969).

Section 703(e) of Title VII requires that the BFOQ must be "reasonably necessary to the normal operation of that particular business." In *Diaz v. Pan American World Airways*, 442 F.2d 385 (5th Cir.), *cert. denied* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), the Court interpreted § 703(e) to mean that, in order to establish a BFOQ defense, an employer must prove that "the essence of the business operation would be undermined by not hiring members of one sex exclusively," 442 F.2d at 388.

In addition to asserting that hiring employees of one sex would undermine the essence of its business operation, the employer must also show that it had a factual basis for such a belief, *Weeks, supra; Long v. Sapp*, 502 F.2d 34 (5th Cir.1974); *Meith v. Dothard*, 418 F.Supp. 1169 (M.D. Ala.1976), *affirmed in part and reversed in part sub. nom. Dothard v. Rawlinson, supra; Cheatwood v. Southern Central Bell Telephone & Telegraph Co.*, 303 F.Supp. 754 (M.D.Ala.1969). In *Dothard, supra*, 433 U.S. at 335, 97 S.Ct. at 2729, the Supreme Court held that the employer must have a "basis in fact" for its belief that no members of one sex could perform the job in question.

Title VII was meant to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification," *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Although a number of standards have been proferred for determining whether a BFOQ exists, the Federal Courts are in agreement that the refusal to hire a woman on the basis of stereotyped characterizations is prohibited, *see Dothard, supra*, 433 U.S. at 333, 97 S.Ct. at 2728.

At the outset, it is necessary to distinguish the instant cause from *Dothard, supra*, which involved the same Alabama prison system that was deemed to be Constitutionally intolerable, and characterized by Federal District Judge Frank M. Johnson as one of "rampant violence," "inhuman conditions," "horrendously overcrowded, ... dilapidated, ... [and] filthy." *See Pugh v. Locke*, 406 F.Supp. 318, 323–325 (M.D.Ala.1976), *modified in part* 559 F.2d 283, *cert. granted, remanding on other grounds and dismissing state parties*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The *Dothard* Court painstakingly limited its decision, which upheld a male BFOQ in the Alabama penitentiaries, to that "peculiarly inhospitable" environment.

Although the issues in *Dothard* are dissimilar from the issues in the present controversy, it, nevertheless, provides this Court with an analytical framework for evaluating the proffered BFOQ in the case at bar. The Supreme Court, in rejecting the policy which would have allowed each woman to make her own self-evaluation of the risk, as well as the potential consequence, of assuming the responsibilities of a contact position within a prison, employed a balancing test which weighs Title VII rights against the possibility and probability of disruption within the prison system. However, the probabilities of sexual assaults on female correctional officers at Jackson, Ionia and Marquette, as well as the potential impact on prison discipline and rehabilitation opportunities, do not appear to be of such a magnitude that it

would warrant an exception to the proscriptions of Title VII. In *Dothard*, the Supreme Court was considering a brutal, jungle-like maximum security environment in Alabama. In balancing the Plaintiff's rights against an important and legitimate goal (to wit, institutional stability), the Supreme Court mandated that courts and administrative bodies weigh probabilities of instability. In *Dothard*, the balance tipped toward recognizing a BFOQ. In this case, it tips toward the recognition of Plaintiffs' rights. The existence of a legitimate BFOQ defense depends on whether discrimination is compelled by business considerations. Thus, this Court must now resolve the three broad ·questions which were apparently sanctioned by *Dothard*.

■ In order to sustain their BFOQ defense, Defendants must initially show that the legitimate functions of the Michigan prisons, which were involved in this litigation, would have been undermined by the promotion of women to positions at the grade 07 level and above. Second, Defendants must prove that there is reasonable cause to believe that all, or substantially all, of Plaintiffs would have been unable to perform the job safely and efficiently. Finally, Defendants, as employers, must show that the failure to promote women was based on actual sexual characteristics rather than upon stereotyped assumptions.

There is also a possible fourth criteria. In *Harless v. Duck*, 619 F.2d 611 (6th Cir. 1980), the Court discussed *Dothard*, and found that the BFOQ defense is not available if there was some less restrictive alternative available to the employer which could have avoided the sex classification. The Court stated:

> The burden of proof in a Title VII action shifts: first, plaintiff must establish a prima facie case by demonstrating disparate impact or disparate treatment; then, defendant can rebut by establishing a defense, such as, business necessity, for example, that the test bears a manifest relationship to successful and efficient job performance; finally plaintiff can establish liability, despite a valid defense, if an alternative selection device not creating the disparate impact can be proven.

619 F.2d at 616 n. 6.

Title VII of the 1964 Civil Rights Act, in its sex-based proscriptions, embodies a realistic, non-romantic, and non-paternalistic attitude toward women and their role within the work force in today's society. The implicit mandate of Title VII is that a. woman should be evaluated and treated by an employer on the basis of her individual qualifications and not on the basis of any assumptions regarding the characteristics and qualifications of women as a group, *see Dothard v. Rawlinson, supra*. Thus, on the basis of the egalitarian pronouncements of the Supreme Court in the area of sex discrimination, the beneficial purposes of Title VII, and the extremely narrow and limited nature of the BFOQ exception, this Court must be cautious in those instances where it has been asked to recognize a BFOQ, which, in turn, would allow sex-based discrimination.

Security and order are essential in any correctional facility. Surveillance of inmates in the cell blocks and shower rooms appears to be important to these goals. Defendants argue that women should not be allowed to work within the housing units at Jackson, Ionia and Marquette. Defendants' argument is without merit because (1) it assumes that inmates retain an unqualified protected right of privacy under the Constitution, and (2) it is based on stereotypical sexual characterization that a viewing of an inmate while nude or performing bodily functions, by a member of the opposite sex, is intrinsically more odious than the viewing by a member of one's own sex. Neither assumption can withstand traditional scrutiny.

Confinement and the needs of the penal institution, by their nature, impose certain limitations on any Constitutional right to privacy which may have been retained by inmates, *Jones v. N.C. Prisoners Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). Any such Constitutional rights must be bal-

anced against the "legitimate penological objectives of the corrections system," *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). An inmate's right to privacy must thus be balanced against the legitimate penological objective of providing equal job opportunities regardless of sex, as mandated by Title VII, *Avery v. Perrin*, 473 F.Supp. 90, 92 (D.N.H.1979). *See also Forts v. Ward*, 471 F.Supp. 1095, 1098 (S.D.N.Y.1979); *Wolfish v. Levi*, 439 F.Supp. 114, 159–161 (S.D.N.Y. 1977). Jacobs, *The sexual integration of the prison's guard force; a few comments on Dothard v. Rawlinson*, 10 Toledo Law Review 389 (1979).

At least one Federal District Court has suggested that since inmates are constantly open to the view of male guards and fellow inmates while nude or performing bodily functions, the privacy rights of inmates have already been seriously eroded in the interest of institutional convenience, security and efficiency. *See* Footnote 4 in *Gunther v. Iowa State Men's Reformatory*, 462 F.Supp. 952, 956 (N.D.Iowa 1979), *affirmed* 612 F.2d 1079 (8th Cir.1980), *cert. denied* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

In an attempt to formulate a more specific criteria for determining the boundaries of an inmate's right to privacy, a California Superior Court in San Luis Obisbo County held that:

> ... no privacy rights exist for prisoners to successfully complain of their bodies being viewed in whatever condition or position their bodies then happen to be unless such viewing is conducted for purposes of;
>
> (1) embarrassment of the prisoner
>
> (2) sexual or emotional gratification of the viewer
>
> (3) infliction of cruel or unusual punishment on the inmate
>
> (4) depriving the inmate of his property without due process of law
>
> (5) depriving him of First, Sixth or Eighth Amendment protection

*In re Montgomery*, 9–18–78 (Opinion, p. 9).

In *Montgomery, supra*, the Court specifically rejected the notion that a viewing of nude or defecating inmate by a correctional officer of the opposite sex is intrinsically more odious than a viewing by a correctional officer of the same sex:

> This court may well agree that the viewing of urinating, defecating, or showering by *anyone* offends the actor's sensibilities. But once such a viewing is justified by the prison's need for security, the viewing is not demonstrably more significant whether by male or female.

*Id.* at page 9 (emphasis added).

In *Gunther, supra*, which involved circumstances very similar to this case, a female correctional officer, who was employed at an all male correctional facility, was prohibited from being promoted on the basis of her sex, even though she was well qualified in every other respect. Although the case did not directly address the privacy issue, the Court did suggest that:

> ... mores as to being viewed naked by the opposite sex under certain circumstances are bound to change as women become further integrated in the occupational and professional world.... The traditional rule that only male guards may view male inmates under these conditions may derive from just the type of stereotypical value system condemned by Title VII.

462 F.Supp. 952, 956, fn. 4.

In Footnote 5 of his dissent in *Dothard, supra*, 433 U.S. at 346, 97 S.Ct. at 2735, Justice Marshall refuted some of the most commonly expressed fears that are implicit in the privacy argument when he suggested that:

> [I]f women guards behave in a professional manner at all times, they will engender reciprocal respect from inmates, who will recognize that their privacy is being invaded no more than if a woman doctor examines them. The suggestion implicit in the privacy argument that such behavior is unlikely on either side is an insult to the professionalism of guards and the dignity of inmates.

Recent Federal Court decisions have denied the BFOQ exception when the in-

mates' right to privacy argument has been used to justify sexually discriminatory hiring and promotion policies in state correction facilities. In *Forts v. Ward, supra,* female inmates sought to enjoin the assignment of male correctional officers to duties in the housing and hospital units of the correctional facility, where the women would be involuntarily exposed to the view of such officers. In addressing the question of equal employment opportunity, the Court specifically stated that "... the job of a correctional officer can be equally well performed by any qualified and trained man or woman. Sex is therefore not a BFOQ ... and these positions ... must be opened to any bidder regardless of sex," *id.* at 1099. In *Avery v. Perrin,* 473 F.Supp. 90 (D.N.H.1979), a male state prisoner filed a petition in which he complained that his Constitutional right of privacy had been infringed because a female guard delivered mail to, or walked by, his cell at a specified time each day when he might be observed naked or using the toilet facilities. The Court held that "Plaintiff's right of privacy is not infringed by the delivery of mail by a female guard when viewed in light of the lofty goals of equal opportunity," *id.* at 92.

Although some state court decisions have recognized a BFOQ exception to protect the inmates' privacy interest, those cases are easily distinguishable from the case at bar. In *Iowa Department of Social Services v. Iowa Merit Emp. Dept.,* 261 N.W.2d 161, 165 (Iowa 1977), the Iowa Supreme Court noted that "there would be a constitutional violation of inmates' rights if the guards were women."

Two of the state courts' decisions, which had been relied upon by the Iowa Supreme Court, in *Iowa Department of Social Services, supra* (to wit, *In re Long,* 55 Cal. App.3d 788, 127 Cal.Rptr. 732 (1976) and *City of Philadelphia v. Pennsylvania Human Rights Commission,* 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973)), were decided on facts that are peculiar to youth authority facilities. In the context of youth detention facilities, state courts have been understandably more zealous to protect the pri-

vacy rights of young people who have been detained. The state courts have been concerned not only with the need for bodily privacy, but also with the psychological effect on the children who may feel embarrassed, awkward and degraded by having members of the opposite sex observe them. At least one Court has noted that the humiliation and embarrassment which some children might feel could result in the loss of self esteem that would hinder an individual's rehabilitation. *See Long v. California State Personnel Board,* 41 Cal.App.3d 1000, 1014, 116 Cal.Rptr. 562, 571 (1974).

When a male challenged a rule which denied him the opportunity to take an examination for the position of a female corrections officer, the New York Supreme Court, in *Carey v. New York State Human Rights Appeal Board,* 61 A.D.2d 804, 402 N.Y.S.2d 207 (1978), determined that sex was a BFOQ for that position. However, in *Carey,* the Plaintiff's challenge was directed only at the BFOQ clause that was contained in the State Civil Service Statute. They never addressed the issue of whether a BFOQ was justified under Title VII. The United States Supreme Court later refused to hear the case for the absence of a federal question, 444 U.S. 891, 100 S.Ct. 198, 62 L.Ed.2d 128 (1979).

■ In the case at bar, any contention by Defendants that they are entitled to the Title VII BFOQ exception on the basis of the inmates' right to privacy argument is without merit. Inmates do not possess any protected right under the Constitution against being viewed while naked by correctional officers of the opposite sex. The entire basis of the argument rests on assumptions and stereotypical sexual characteristics which have been expressly prohibited by Title VII, *Dothard, supra,* and other Supreme Court decisions that refute principals of sexual stereotyping.

■ The only other possible basis for a BFOQ comes from the testimony of Mintzes; namely, that having women in housing units was not good for the security or safety of the prison because of sex

offenders' "special hostility" toward females, thereby increasing their vunerability to assault. Certainly, in a critical area of employment, the argument that a particular job is too dangerous or unpleasant for all women is clearly contrary to the purpose of Title VII. It is consistent with common sense, fairness and the state of the law to say that a blanket exclusion of women, in order to protect them from the rigors and difficulty of the prison system, is clearly unlawful under Title VII. The only authority that lends any support to this protective BFOQ argument is *Dothard, supra,* which, as noted earlier, is clearly distinguishable from the case at bar. There is no evidence in the instant case of poor management, under-staffing, overcrowding, or extreme or unusual dangerousness in any of the three institutions in question. Clearly, there is no evidence of mismanagement, rampant violence or of a junglelike atmosphere in any of these facilities. Consequently, the holding of *Dothard, supra,* is too limited to have any applicability in the instant case. This Court must look beyond that case for any precedential authority. The Supreme Court, in *Dothard, supra,* noted, in carefully limiting its decision to the factual situation before it, that "in a normal, relatively stable maximum security prison—characterized by control over the inmates, reasonable living conditions, and segregation of dangerous offenders—women guards could be used effectively and beneficially ... in all male penitentiaries," 433 U.S. at 336, n. 23, 97 S.Ct. at 2730, n. 23. This dicta supports Plaintiffs' position that the institutions in this case (Jackson, Ionia and Marquette), based upon the evidence or lack thereof, fit the quoted language.

What the Plaintiffs seek in this case—equal employment opportunities—is in complete harmony with the so-called "normalization" or "stabilizing or softening" theories of penology, which find a basis in the official Department of Corrections affirmative action policy that was initiated in June 1977. This policy directive, which was written by Boyett, issued by Johnson, and supported by Mintzes, states, in pertinent part:

> *Women:* Historically, women have been excluded from employment in correctional facilities and as probation and parole officers dealing with male clients, in many cases without justification. As a matter of fairness and equity, women must not be excluded from jobs they are qualified for and capable of performing. Furthermore, the presence of women, where feasible, in correctional facilities for males is a healthy influence and contributes to more normal social conditions.

Eradicating the discriminatory treatment toward women will not only be fair, equitable and bring Defendants' policies and practices into harmony with the state of the law under Title VII, but it will also make for a healthier and more rehabilitative atmosphere for the inmates.

▆ Even if it had been determined that a specific BFOQ allowed Defendants to keep women out of the housing units, this Court would, nonetheless, be required to determine that Defendants had discriminated against Griffin, Anderson and the Plaintiff class by failing to establish alternate policies and practices to protect their respective and collective equal employment and promotional opportunities. Defendants have failed to establish that there is any conflict between the equal employment opportunity rights of the Plaintiffs and the inmates' rights of privacy or safety. This conflict, which has been articulated by Defendants as irreconcilable, could reasonably be avoided by altering their own work assignment or promotional policies. The failure of Defendants to offer any explanation as to how the privacy rights of inmates would necessarily preclude women from equal promotional employment opportunities is an indication that Defendants have deliberately formulated their work assignment and promotional policies to produce a direct conflict between the inmates' right to minimal privacy and Plaintiffs' equal employment opportunities as mandated by Title VII. Federal Courts have consistently required employers to demonstrate that such a conflict could not be avoided. In

some instances, Federal Courts have resolved the conflict by ordering the inmates or employees to alter their daily routines where it is reasonable to do so, *see Ludtke v. Kuhn,* 461 F.Supp. 86 (S.D.N.Y.1978). In other cases, Federal Courts have required the employer to alter work assignment policies, *see Fesel v. Masonic Home of Delaware, Inc.,* 447 F.Supp. 1346, 1351 (D.Del.1978), *affirmed* 591 F.2d 1334 (3rd Cir.1979). The same reasoning must be applied to the instant conflict between inmate privacy rights and the equal employment opportunity rights of female correctional officers, *see Meith v. Dothard, supra. See e.g., Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex.1974).

## VII. CONCLUSIONS OF LAW

■ The Defendants' employment and promotional policies and practices at the Jackson, Ionia, and Marquette correctional facilities constitute illegal sex-based discrimination against Griffin, Anderson and the Plaintiff class, in violation of Title VII of the 1964 Civil Rights Act, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–2(a)(1).

■ Defendants are guilty of retaliatory conduct, in violation of Title VII of the 1964 Civil Rights Act, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–3(b), toward Griffin and Anderson.

Griffin, Anderson and the Plaintiff class are entitled to all damages and remedies which are permitted by Title VII, including compensatory relief, back pay, promotions, fringe benefits, seniority rights, attorneys' fees and costs.

## VIII. REMEDY

The Court must now turn to the question of proper relief for Plaintiffs.

■ First, Defendants must immediately eliminate the artificial barriers which have acted to preclude Plaintiffs from promotions to positions at the grade 07 level and above. Defendants must immediately promote Plaintiffs to the positions which they would have attained in the absence of the impermissible discrimination.

Second, Defendants must cease and desist from further retaliation against Plaintiffs on the basis of their sex and their efforts to pursue their grievances.

■ Finally, Plaintiffs are entitled to recover a dollar amount that will provide adequate compensation for the losses that they have suffered because of the discrimination which has been practiced against them. Those Plaintiffs, who would have been promoted to the grade 07 level or above, in the absence of discrimination, are entitled to recover backpay. While Plaintiffs must mitigate the damages, Defendants must bear the burden of establishing that (1) the Plaintiffs' damages could have been avoided, (2) there were suitable positions available which Plaintiffs could have discovered and for which they were qualified, and (3) Plaintiffs failed to use reasonable care and diligence in seeking such positions.

The Court, having awarded compensatory damages to Plaintiffs, will refer this cause to a United States Magistrate for the purpose of conducting an evidentiary hearing to determine (1) the specific identity of those persons who will directly benefit from the provisions hereunder, and (2) the amount of damages which are to be awarded to each Plaintiff.

■ The Court will reject Plaintiffs' request for punitive damages, because they have failed to demonstrate that Defendants acted in such an egregious and outrageous manner which would justify an award of more than the compensatory damages which have already been awarded.

Plaintiffs' attorney may file a proper petition for assessment of attorney's fees. Costs will be awarded to Plaintiffs.

IT IS SO ORDERED.